**Steve CARTER, in his official capacity as Attorney General of the State of Indiana, and Adam M. Warnke, in his official capacity as Deputy Attorney General and Section Chief for Tobacco Litigation, Appellants–Defendants,**

v.

**CAROLINA TOBACCO COMPANY, INC., Appellee–Plaintiff.**

No. 49A04–0503–CV–151.

Court of Appeals of Indiana.

Sept. 17, 2007.

Steve Carter, Attorney General of Indiana, Lawrence J. Carcare, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellants.

Jackie M. Bennett, Jr., F. Anthony Paganelli, Sommer Barnard PC, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Today we are asked to determine what it means to manufacture cigarettes under Indiana law. The trial court determined that the Indiana Office of Attorney General (OAG), the appellant-defendant in this case, erroneously refused to list the "Roger" brand of cigarettes in its Directory of Cigarettes Approved for Stamping and Sale (the Directory) because appellee-plaintiff Carolina Tobacco Company, Inc. (CTC) allegedly was not a tobacco product manufacturer (TPM). In essence, if CTC is not the manufacturer of "Roger" cigarettes, CTC may not sell that product in Indiana.

Steve Carter and Adam Warnke in their official capacities as Attorney General and Deputy Attorney General and Section Chief for Tobacco Litigation, respectively, claim that the trial court erred in entering injunctive and declaratory relief against them requiring that CTC and Roger cigarettes be certified and listed as a non-participating TPM in the Directory. Put another way, the OAG asserts that CTC did not manufacture Roger cigarettes and thus is precluded from selling cigarettes in Indiana. Alternatively, the OAG maintains that even if CTC can be deemed the manufacturer of the cigarettes, the trial court's order granting CTC's request for injunctive relief was overly broad. Concluding that the trial court properly determined that CTC was the manufacturer of the cigarettes and finding no other error, we affirm.

## FACTS

### Statutory Background

In November 1998, major tobacco companies entered into a Master Settlement Agreement (the MSA) with the representatives of 46 states, including Indiana. In accordance with the MSA, those states (the Settling States) agreed to dismiss their lawsuits or refrain from filing suit against the tobacco companies. The tobacco companies agreed to make yearly payments to the Settling States, and those payments were to be used to defray healthcare costs from smoking-related illnesses and to fund smoking prevention programs.

The TPMs that elect to participate in the MSA are known as participating manufacturers. However, the MSA does not—and cannot—require all manufacturers to participate. Thus, tobacco manufacturers that choose not to participate in the MSA are known as non-participating manufacturers (NPMs). CTC is an NPM.

In order to obtain the maximum benefits under the MSA, the states were required to enact certain legislation known as Qualifying Statutes. These statutes require, among other things, that NPMs make annual payments based on their annual cigarette sales, into an interest-earning escrow account. The escrowed funds are used to pay any judgment or settlement of claims brought against the NPMs.

Gary Wilson, a consultant to a number of state attorneys general across the country, testified that the purpose of the MSA [was] to get as many cigarettes subject to all of the marketing and other controls of the MSA, and to have the companies pay a portion of the costs of—that were being inflicted on the States—by the cigarettes—that were being (inaudible) in the States. Alternatively, because an agreement wouldn't bind people who didn't sign on to it. The escrow statute prevents free rider problems and economic externalities from sitting out there that would allow companies to exploit the position of not being a member.

Tr. p. 443. Prior to the changes in the escrow amounts that were required to be paid, NPMs concentrated their sales in particular states and made only nominal payments to the accounts.

Indiana's Qualifying Statute is codified at Indiana Code section 24–3–3–1 et seq. Thereafter, in July 2003, our General Assembly enacted additional Indiana "complementary" legislation relating to the Qualifying Statute (the Complementary Statute), which is codified at Indiana Code section 24–3–5.4–1 et seq. This statute requires, among other things, that TPMs file an annual certification with the Indiana Department of Revenue and with the Office of the Indiana Attorney General.

In accordance with the Qualifying Statute, a TPM is generally defined as the entity that "directly (and not exclusively through any affiliate) ... manufactures" the cigarettes for which it seeks certification under the Complementary Statute. I.C. § 24–3–3–10.[1] However, neither the MSA, the Qualifying Statute, nor the Complementary Statute offer any definition of "manufacture" or "directly manufacture."

Pursuant to the certification that must be filed with the state agencies, a company signifies its intent to sell its product in Indiana. An applicant also certifies: (i) the number of cigarettes it sold in Indiana during the prior year; (ii) the amount deposited into its escrow account during the current year for prior year sales; and (iii) its status as a TPM of its identified brand families as of the date the form is completed. The Complementary Statute further requires the Indiana Attorney General to develop and publish on a website a directory listing all TPMs that have provided current and accurate certifications, as well as the tobacco brand families that are listed on the certification forms (the Directory). Additionally, the Complementary Statute provides that it is unlaw-

---

**1.** This statute provides in full that
"tobacco product manufacturer" means an entity that after June 30, 1999, directly (and not exclusively through any affiliate):
(1) manufactures cigarettes anywhere that such manufacturer intends to be sold in the United States, including cigarettes intended to be sold in the United States through an importer (except where such importer is an original participating manufacturer (as that term is defined in the Master Settlement Agreement) that will be responsible for the payments under the Master Settlement Agreement with respect to such cigarettes as a result of the provisions of subsection II(mm) of the Master Settlement Agreement and that pays the taxes specified in subsection II(z) of the Master Settlement Agreement, and provided that the manufacturer of such cigarettes does not market or advertise such cigarettes in the United States);
(2) is the first purchaser anywhere for resale in the United States of cigarettes manufactured anywhere that the manufacturer does not intend to be sold in the United States; or
(3) becomes a successor of an entity described in subdivision (1) or (2).
The term "tobacco product manufacturer" does not include an affiliate of a tobacco product manufacturer unless the affiliate itself falls within subdivision (1), (2), or (3).

ful for any person to tax, stamp, sell, offer to sell, or possess for sale, cigarettes of a TPM or brand family that is not included in the Directory.

The NPMs do not pay as much into the fund as do the participating manufacturers under the MSA. Hence, the OAG seeks manufacturers of cigarettes to be participants under the fund. Thus, in the event that CTC is not considered the "manufacturer" of Roger cigarettes, its product will be considered contraband and CTC will be removed from the OAG's directory.

### Roger Brand Cigarettes

In 1993, David Redmond formulated a business plan for manufacturing, shipping, distributing, and selling cigarettes in Eastern Europe. That same year, Redmond coined the name "Roger" for his new cigarette, which was initially sold in the former Soviet Union and other Eastern Bloc countries. From 1993 to 1995, Roger brand cigarettes were assembled in the Phillipines by the Sterling Tobacco Corporation (Sterling Tobacco). Redmond then moved the production of the cigarettes to Malaysia, where the cigarettes were produced through the end of 1996. Thereafter, Redmond decided temporarily to suspend the production of Roger cigarettes so he could change the strategy for the brand's production and distribution in light of increasing competition in the former Soviet Union and other Eastern Bloc countries. In late 1997, Redmond sought the input of consultants in the tobacco industry to formulate a plan to sell Roger cigarettes in North America.

Anticipating the settlement of the ongoing tobacco litigation and cigarette price increases that would inevitably result from such a settlement, Redmond determined that there was a market in the United States for an inexpensive "price value" cigarette, which was also known as a fourthtier cigarette. Tr. p. 51–52. Thus, Redmond prepared, tested, and completed a business plan for manufacturing, shipping, distributing, and selling Roger brand cigarettes in the United States.

Sometime in late 1998 or early 1999, Redmond contacted House of Prince Riga (HOPR) in Latvia about becoming the next assembly site for Roger cigarettes and asked HOPR to prepare some test samples for evaluation. Prior to this contact, HOPR had no involvement whatsoever with Roger cigarettes. In August 1999, Redmond formed CTC to produce the Roger brand of cigarettes in the United States.[2]

In November 1999, CTC signed a contract with HOPR, setting forth the terms under which HOPR would make Roger cigarettes for CTC. HOPR assembled Roger cigarettes to conform with Redmond's standards from 1999 through April 2003. During that time, Redmond and several CTC employees spent a number of months in Latvia, where they oversaw the setup and startup of assembly. Redmond personally supervised everything from paper stock and printing proofs to filter paper to raw tobacco. Although HOPR owned the building, Redmond spotchecked everything from production efficiency and quality control to labor relations at the plant. CTC's control of the HOPR factory was so extensive that when HOPR desired excess capacity in the factory to produce cigarettes for another company, HOPR was required to obtain CTC's permission to do so in the form of

---

**2.** The Tobacco Manufacturer Certificate that CTC filed indicates that the company is based in Portland, Oregon. The form also identifies C T Corporation Systems in Indianapolis as the registered agent for service of process. Ex. 3.

an amendment to the parties' original contract.

As early as June 14, 2001, HOPR was concerned that it might be deemed the manufacturer of Roger brand cigarettes. Even though Redmond saw no competitive advantage for a company to be an NPM—as compared to being a subsequent participating manufacturer under the MSA—he acknowledged that NPMs previously had a competitive advantage because they were able to obtain refunds of escrow payments if they exceeded certain amounts.

In early 2003, CTC's relationship with HOPR began to deteriorate and, in April 2003, HOPR terminated its relationship with CTC. From 1999 to 2002, CTC deposited a total of $816,566.72 into an escrow account for sales made in Indiana. The Indiana Department of Revenue determined that Roger brand sales from 1999 to 2002 amounted to 283,885,000 cigarettes.

Anticipating the need to locate another factory for the production of his cigarettes, Redmond began consulting with various entities in South Africa about becoming the next assembly site for his product. On May 16, 2003, CTC entered into a production agreement with African American Tobacco Ltd. (AAT). CTC made arrangements for one of the assembly lines that had been used at HOPR in Latvia to be sold to AAT. CTC loaned AAT the purchase money and subsequently leased this assembly line from AAT for producing the cigarettes. CTC also purchased an assembly line of its own for installation in South Africa at a cost of nearly $2 million.

Production began in early July 2003. CTC planned to produce the cigarettes in a factory that AAT had contracted to purchase from Marley SA Ltd., a floor products manufacturer. CTC's plan in July 2003 was to lease the Marley Factory from AAT and to use it for storage of raw materials, cigarette assembly, packaging, warehousing, and office space.

In July 2003, substantial renovations of the Marley Factory commenced under Redmond's supervision. Redmond specified the extent of the renovations and oversaw both the selection of the contractors and the scope of their work. Because the Marley Factory was unusable for cigarette production in July 2003, CTC undertook limited-scale production of its cigarettes at another facility as of July 10, 2003. CTC temporarily placed and operated its owned and leased assembly lines in excess factory floor space at this other facility, which was located less than one kilometer from the Marley Factory.

Upon completion of the remodeling, the assembly lines were moved to the renovated facility and full-scale production of Roger cigarettes commenced under the on-site, day-to-day supervision of John Stubbs, the vice president and general manager of the South African branch of CTC. The Roger brand cigarettes that were made in South Africa are identical in all respects to those that had been produced by HOPR.

At all times since production of Roger cigarettes began in Latvia and South Africa, CTC has maintained the following elements of control over product formulation, actual production, and distribution of the cigarettes:

1. Only CTC has the right to use the federally registered trademark, "Roger" and the internet domain name "rogercigarettes.com."

2. Only CTC has its name on each package of Roger brand cigarettes.

3. Only CTC can determine the tobacco families being produced.

4. Only CTC can determine how the Roger brand name will be marketed, including any advertising.

CTC pays for all marketing and advertising of Roger cigarettes.

5. CTC owns the product formula for Roger brand cigarettes, and only CTC can determine which tobacco flavors will be included in the cigarette.

6. CTC reports annually to the Food and Drug Administration and the Department of Health and Human Services with respect to the formulas and contents of Roger brand cigarettes.

7. Only CTC can determine the design of all Roger packaging.

8. No company or entity other than CTC appears by name on any Roger packaging, including packs, cartons, and master cases.

9. CTC holds title to its raw materials and controls storage of tobaccos.

10. Only CTC controls the techniques to be used in producing Roger brand cigarettes and only CTC has created a procedures manual to detail the techniques for fabricating Roger brand cigarettes.

11. Only CTC can determine which machines and assembly lines will be used to fabricate its cigarettes.

12. Only CTC can determine the schedules for cigarette production and the amount of production for each shift. Indeed, without the demand and direction of CTC, no Roger brand cigarettes could ever be produced or sold.

13. Only CTC sets and maintains all quality control standards as to the manufacture of Roger brand cigarettes.

14. Only CTC arranges for shipment of Roger brand cigarettes into the United States, and then to its customers throughout the county.

15. Only CTC pays the federal excise tax on Roger brand cigarettes.

16. Only CTC sells Roger brand cigarettes to distributors throughout the United States.

Tr. p. 61–63, 69–74, 135–50.

### Roger Cigarettes in Indiana

To comply with the Qualifying Statutes enacted by the Settling States in April 2000, CTC established an escrow account with the Bank of America. For its sales in Indiana beginning in 2000, CTC has deposited a total of $816,566.72 into the escrow account for sales of Roger cigarettes made in Indiana. The State has accepted CTC's escrow deposits, all of which were reported to the State on prescribed forms.

In the absence of any definition of "manufacture" in the MSA or the statutes, the Indiana Attorney General equated the term "manufacture" with the word "fabricate" and determined that only an entity that physically assembled or "fabricated" cigarettes could be a TPM for purposes of the Qualifying Statute and the Complementary Statute. In other words, it was determined that an entity that did not fabricate its own cigarettes was not a TPM.

Beginning in late spring or early summer 2003—even before the Complementary Statute went into effect—the OAG began communicating and exchanging information with the National Association of Attorneys General (NAAG) and other entities about the status of CTC. There was general concern that NPMs were increasing their market share and that downward adjustments would result with regard to payments made under the MSA. There was discussion about compensating the states for medical needs that related to tobacco usage, as well as whether CTC should be deemed the TPM of Roger brand cigarettes.

On August 22, 2003, CTC learned through its distributors that the OAG intended to exclude CTC and Roger from the Directory. Upon receiving this information, CTC contacted Warnke, who confirmed that the OAG intended to exclude CTC from the Directory.

On August 28, 2003, CTC filed a complaint for injunctive relief and declaratory judgment against the OAG. CTC claimed that it was the manufacturer of Roger cigarettes and that the OAG's basis for determining otherwise was "uninformed, arbitrary, and capricious." Appellants' App. p. 33. CTC asserted that if the OAG excluded it or Roger cigarettes from the Directory, the cigarettes may no longer be sold legally in Indiana "and all of CTC's cigarettes on store shelves in Indiana will immediately become contraband, [and] CTC will lose sales, customers, market share, and relationships with its Indiana distributors." Id. at 34. In sum, CTC claimed that the OAG's action of excluding it from the Directory constituted "a disingenuous subterfuge designed to favor the Participating Manufacturers over NPMs such as CTC." Id. at 33.

CTC claimed that "such actions by or on behalf of the State would deprive CTC of liberty and property without due process of law." Id. Thus, CTC maintained that it was entitled to an injunction prohibiting the appellants from unilaterally and unconstitutionally revoking CTC's right to sell Roger cigarettes by excluding it from the Directory. CTC also requested a declaratory judgment that CTC is a "manufacturer of tobacco products for purposes of all relevant Indiana statutes." Id. As a result, CTC requested the following relief:

A.  A temporary restraining order and a preliminary injunction prohibiting the defendants from unilaterally and unconstitutionally revoking CTC's right to sell its Roger brand cigarettes in Indiana by excluding them from the Directory when it is published on September 2, 2003.

B.  A permanent injunction prohibiting defendants from promulgating the Directory without including CTC and/or Roger cigarettes therein.

C.  declaratory judgment in favor of CTC and against Defendants, including a determination that CTC is a manufacturer of tobacco products for purposes of all relevant Indiana statutes.

Id. at 35. Following a hearing on September 22, 2003, the trial court granted CTC's request for preliminary injunctive relief. In particular, the trial court determined that the OAG was preliminarily enjoined from

(a) enforcing Ind.Code § 24–3–5.4–1 et seq. against Plaintiff Carolina Tobacco Company or any of its distributors; (b) seizing any Roger brand cigarettes on account of the violation of the 2003 Legislation; (c) taking any actions that would interfere with the sale of Roger brand cigarettes in the State of Indiana on account of a violation of the 2003 Legislation; and, (d) maintaining or displaying any website directory of tobacco product manufacturers that does not include plaintiff Carolina Tobacco Company and identify it as the manufacturer of its Roger brand cigarettes.

Id. at 44–45.

Thereafter, a bench trial was conducted with regard to CTC's request for permanent injunctive relief. The trial court entered judgment for CTC and issued the following findings of fact on January 18, 2005:

48.  The materials that the OAG received from NAAG and other states' attorneys general about CTC did *not* include CTC's con-

tract with HOPR for the fabrication of Roger cigarettes.

49. Ms. Orbison [3] testified that a review of CTC's contract with HOPR would have been an important step in investigating the question of whether CTC was the manufacturer of Roger cigarettes.

50. Even though it had not reviewed CTC's contract with HOPR, the OAG determined by mid-July 2003 that Carolina was not the manufacturer of Roger brand cigarettes.

51. A month later, on August 15, 2003, CTC timely submitted its form TMC1 to the OAG. The OAG received CTC's completed form on August 16, 2003.

52. On August 22, 2003 CTC learned through its distributors that Defendants intended to exclude CTC and Roger from the Directory.

53. OAG never contacted CTC to request a copy of its contract with HOPR, or any other documents pertaining to CTC's contention that it was the manufacturer of Roger cigarettes.

54. Upon learning that it was about to be excluded from the Directory that was set to be posted on the OAG's website on September 2, 2003, CTC immediately called Deputy Attorney General Adam Warnke, then a Tobacco Litigation Section attorney and now Action Section Chief. Mr. Warnke confirmed that defendants intended to exclude CTC from the Directory when it was published the following week. According to Mr. Warnke, the stated basis for this action was that, in Defendants' eyes, CTC was not the tobacco product manufacturer of Roger cigarettes and therefore was ineligible for inclusion in the Directory, which is a list Composed exclusively of "manufacturers."

55. On August 27, 2003, Mr. Warnke sent written confirmation to CTC's counsel that CTC would be excluded from the Directory because the OAG had decided that CTC did not "manufacture" Roger cigarettes.

56. CTC was not given any opportunity to present evidence or be heard by any administrative body before the decision to exclude CTC from the Directory was made, nor was CTC provided any opportunity to appeal the decision administratively.

57. CTC's expert witness, Robert Haywood, testified that, based on CTC's agreement with HOPR in November 1999, its agreement with AAT in June 2003, and on his investigation into the facts and circumstances surrounding the production of Roger cigarettes, that CTC directly manufactured Roger cigarettes at all times since the company's inception, as the term is used in the context of international manufacturing. Therefore, according to Mr. Haywood, CTC was and is the tobacco product manufacturer of Roger cigarettes.

58. Mr. Haywood further testified that CTC's practice of "production sharing," that is, contracting with or outsourcing to foreign factory owners such as HOPR and AAT to perform subordinate tasks in the production process, was a means by

---

**3.** Carol Orbison was the section chief of the Indiana Attorney General's tobacco litigation section in August 2003. Orbison made the final determination that CTC was not the manufacturer of Roger cigarettes. Appellants' Br. p. 55.

which CTC effectively acquired the right to manufacture Roger cigarettes in factories owned by others, under CTC's control.

59. Mr. Haywood further testified that, in his opinion, CTC had always exerted sufficient control over the fabrication of Roger cigarettes in factories owned by other parties to justify a conclusion that CTC—rather than HOPR or AAT—directly manufactured Roger cigarettes.

60. The Defendants' expert witness, Gary Wilson, offered his opinion that "directly manufacture: can only mean "fabricate" in light of the entire context of the MSA, from which the statutory definition of the term derives.

61. Mr. Wilson acknowledged that the MSA had been amended to allow certain companies that signed the MSA as "Subsequent Participating Manufacturers" or "SPMs," to be "deemed" the manufacturers of cigarettes although they clearly did not fabricate, but instead only imported, cigarettes assembled in foreign factories owned by others.

62. Mr. Wilson further acknowledged that an entity that did not own its own factory could exercise sufficient control over the production facility, equipment, and labor force that it properly could be considered the fabricator, and therefore the manufacturer under the MSA, of the cigarettes produced in that factory.

*Id.* at 18–20. The trial court then entered the following pertinent conclusions of law:

4. As a threshold matter, the Court concludes that the term "manufacture" in the Qualifying Statute is vague and ambiguous, and therefore ripe for judicial construction.

5. The Court notes that other Indiana statutes define "manufacture" or "manufacturer" far more broadly than would the Defendants in this instance.

. . .

8. Among other things, the Court is persuaded by the expert testimony of Mr. Haywood concerning the practice of "production sharing," and concludes that whether CTC (or any other NPM) may be regarded as directly manufacturing cigarettes is a fact-sensitive inquiry dependent upon whether CTC exercised sufficient control over the manufacturing process properly to be deemed the entity that directly manufactures the cigarettes in question.

9. The Court's conclusion on this point is buttressed by the testimony of Carol Orbison, who acknowledged that fully ten different fact-specific inquiries (only one of which pertains to fabrication) were relevant to the question of whether an entity manufactured tobacco products. Ms. Orbison conceded that at least eight (and possibly nine) of those ten factors favored a designation of CTC as the manufacturer of Roger cigarettes.

10. The Court's conclusion on this point is further buttressed by the testimony of Defendants' expert, Gary Wilson, who acknowledged that control over the manufacturing process may be relevant, and who also acknowledged that the MSA has been amended in such a manner as to allow companies that are no more than importers of ciga-

rettes fabricated by others to be "deemed" manufacturers of cigarettes, by the simple device of their becoming a signatory to the MSA.

11. *Based on the factual evidence in this case, the Court concludes that, at all times since its founding in 1999, CTC has directly manufactured Roger cigarettes. The Court therefore concludes that CTC has been and continues to be the tobacco product manufacturer of Roger cigarettes.*

12. The Court further concludes that the OAG's decision that CTC did not directly manufacture Roger cigarettes was unreasonable in light of the facts and circumstances present in this case.

*Id.* at 62–64 (emphasis added). As a result, the trial court entered the following judgment in favor of CTC:

A. The Court declares that, for all times during which Roger cigarettes were assembled in Riga, Latvia, CTC was the tobacco product manufacturer of all such cigarettes, as the term is defined by Indiana's Qualifying Statute.

B. The Court declares that, for all times prior to the filing of this lawsuit on August 28, 2003 during which Roger cigarettes were fabricated in East London, South Africa, CTC was the tobacco product manufacturer of all such cigarettes, as the term is defined by Indiana's Qualifying Statute.

C. The Defendants, and any person acting or purporting to act on their behalf, are permanently enjoined and prohibited from removing CTC and/or its Roger brand family of cigarettes from the Directory or its functional equivalent, if such removal is based in whole or in part on a determination that CTC was not the tobacco product manufacturer of such cigarettes for any period on or before August 28, 2003.

Appellants' App. p. 29. The OAG now appeals.

## DISCUSSION AND DECISION

### I. Exhaustion of Administrative Remedies—Subject Matter Jurisdiction

■ The OAG first contends that this case must be reversed because the trial court lacked subject matter jurisdiction. Specifically, the OAG argues that the cause should have been dismissed because CTC failed to exhaust its administrative remedies.

In essence, the OAG's argument with regard to this issue is an attack on the trial court's finding of fact number 56, which provides as follows:

CTC was not given any opportunity to present evidence or be heard by any administrative body before the decision to exclude CTC from the Directory was made, nor was CTC provided any opportunity to appeal the decision administratively.

Appellants' App. p. 19.

■ We first note that when a trial court enters specific findings of fact and conclusions of law with respect to a final judgment, this court applies a two-tiered standard of review. First, we address whether the evidence supports the findings, and then whether the findings support the judgment. *Press–A–Dent, Inc. v. Weigel*, 849 N.E.2d 661, 668 (Ind.Ct.App. 2006), *trans. denied.* The trial court's findings and conclusions will be set aside only if they are clearly erroneous—when the record contains no facts or inferences supporting them. *Id.* A judgment is clear-

ly erroneous when a review of the record leaves the court of appeals with a firm conviction that a mistake has been made. *Id.* Additionally, we neither reweigh the evidence nor assess the credibility of the witnesses. Rather, we consider only the evidence most favorable to the judgment. *Id.*

Here, the OAG asserts that the propriety of its decision not to list Roger cigarettes on the Directory "should have been pursued through administrative and judicial procedures as mandated by the Administrative Orders and Procedures Act." (AOPA). Appellants' Br. p. 16–17. Put another way, the OAG argues that CTC should have considered Deputy Attorney General Warnke's letter of August 27, 2003, stating that it was not going to list the Roger cigarettes in the Directory, as an order under the AOPA. As a result, the OAG contends that CTC was not properly before the trial court when CTC filed its action for injunctive and declaratory relief.

■ In general, we note that the AOPA provides the exclusive remedy for a review of administrative or agency action, and a court's jurisdiction under the AOPA is contingent upon a petitioner's compliance with its statutory mandates. Ind. Code § 4–21.5–5–4. Hence, a party is typically required to exhaust all administrative remedies before it may seek review of any decision of an agency or agency action. *Johnson v. Celebration Fireworks, Inc.,* 829 N.E.2d 979, 982–84 (Ind.2005). Moreover, the courts are deprived of subject matter jurisdiction when a party has an administrative remedy and fails to exhaust it. *Martin v. Monroe Co. Plan Comm'n,* 660 N.E.2d 1073, 1074–75 (Ind.Ct.App. 1996).

An order "means an agency action of particular application that determines the legal rights, duties, privileges, immunities, or other legal interests of one (1) or more specific persons." I.C. § 4–21.5–1–9. And Indiana Code section 4–21.5–1–3 defines an agency as "any officer, board, commission, department division, bureau, or committee of state government that is responsible for any stage of a proceeding under this article," excluding the judicial and legislative departments of government and political subdivisions. Thus, Indiana Code section 4–21.5–3–4—the applicability of which the OAG does not dispute—provides that

(b) When an agency issues an order described by subsection (a), the agency shall give a written notice of the order to the following persons:

(1) Each person to whom the order is specifically directed.

(2) Each person to whom a law requires notice to be given.

A person who is entitled to notice under this subsection is not a party to any proceeding resulting from the grant of a petition for review under section 7 of this chapter unless the person is designated as a party on the record of the proceeding.

(c) The notice must include the following:

(1) A brief description of the order.

(2) A brief explanation of the available procedures and the time limit for seeking administrative review of the order under section 7 of this chapter.

(3) Any information required by law.

A companion statute, Indiana Code section 4–21.5–3–5, states:

(b) When an agency issues an order described in subsection (a), the agency shall give a written notice....

. . .

(c) The notice required by subsection (a) must include the following:

(1) A brief description of the order.

(2) A brief explanation of the available procedures and the time limit for seeking administrative review of the order under section 7 of this chapter. (3) A brief explanation of how the person may obtain notices of any pre-hearing conferences, preliminary hearings, hearings, stays, and any orders disposing of the proceedings without intervening in the proceeding, if a petition for review is granted under section 7 of this chapter. (4) Any other information required by law.

Notwithstanding the OAG's claim that CTC failed to exhaust its administrative remedies and that CTC's claims should have been dismissed, we note that CTC has asserted from the inception of this litigation that it had been deprived of any opportunity for administrative adjudication, either before or after the OAG rendered its decision. Moreover, even assuming that the August 27, 2003, letter amounted to an administrative order, no notice or explanation was provided to CTC of any available administrative appeal procedures that could have been pursued. Indeed, it is undisputed that the OAG did not comply with the above statutory provisions. In fact, the OAG specifically asserts that "although the AG's initial order did not specifically give CTC notice of the AOPA procedure, there is no question but that the procedure was available and that CTC did not exhaust administrative remedies." Appellants' Reply Br. p. 5.

The letter of August 27, 2003, did not provide notice or a "brief description" of the allegedly applicable administrative procedures, which are required by statute. Also, the purported order did not notify CTC of any right or obligation to pursue administrative remedies before filing suit and its existence cannot deprive the trial court of subject matter jurisdiction. *See*

*Smith v. State Lottery Comm'n*, 701 N.E.2d 926, 932–33 (Ind.Ct.App.1998) (recognizing that when the state lottery offered the plaintiff no forms to complete and did not offer any other writings sufficient to initiate an administrative appeal process, there was reason for "grave doubt" as to the availability of administrative remedies). In light of these circumstances, the OAG's claim that the trial court must be reversed because CTC failed to exhaust its administrative remedies fails.

## II. Matters Outside the Record

█ The OAG contends that even if the trial court had jurisdiction over this matter, the judgment in favor of CTC must be reversed because the trial court improperly considered evidence "outside the record." Appellants' Br. p. 23. In essence, the OAG claims that the trial court did not consider the agency record but, instead, improperly based its decision on a de novo review of evidence that was presented during trial.

In resolving this issue, we first note that the OAG neither describes the "agency record" in this case nor affirms that any agency record even existed. Even more compelling, the OAG does not explain what evidence the trial court improperly considered, and it made no objection to the admission of evidence at trial. Indeed, neither before nor during the two-day bench trial was there any mention of the agency record limiting the scope of evidence that the trial court could consider. There were no objections at trial to the testimony of any of CTC's witnesses or to the trial exhibits on the basis that such evidence exceeded the scope of any alleged agency record. Therefore, the OAG has waived this issue. *See SMDfund, Inc. v. Fort Wayne–Allen County Airport Auth.*, 831 N.E.2d 725, 732 (Ind.2005) (holding that a

party may not raise an issue on appeal that was not raised before the trial court).

■■■ Waiver notwithstanding, as we have discussed above, the OAG did not provide CTC with notice and no administrative hearing was held. Moreover, no notification of appeal rights was provided to CTC. Although the OAG directs us to several reported cases allegedly in support of their position, those cases do not apply, inasmuch as the litigation therein began as an administrative adjudication where a record of the proceedings was actually established. In each of those cases, the trial court's role was to review the administrative proceedings. *See Breitweiser v. Ind. Office of Envtl. Adjudication,* 810 N.E.2d 699 (Ind.2004); *Huffman v. Office of Envtl. Adjudication,* 811 N.E.2d 806 (Ind. 2004). Here, there was no administrative proceeding and no agency record. For these reasons, the OAG's claim with regard to this issue fails.

### III. Statutory Construction— CTC as a "Manufacturer"

■■■ The OAG next argues that the judgment must be set aside because the trial court misconstrued a clear and unambiguous statute. Specifically, the OAG maintains that the trial court erroneously concluded that the term "directly manufacture[s]" cigarettes as set forth in the Qualifying Statute was vague and ambiguous. Therefore, the OAG contends that the trial court inappropriately and unreasonably substituted its judgment for that of the OAG in determining that CTC satisfied the statutory definition of "manufacturer."

As the trial court aptly noted,

[t]he principal question before the Court is whether the undefined term "directly manufacture" in the Qualifying Statute should be defined narrowly to mean "fabricate" and nothing else, as argued by Defendants, or whether it means the exercise of control by a putative manufacturer over the entire process by which products are made, as argued by CTC.

Appellants' App. p. 59. As noted above, Indiana Code section 24–3–3–10 provides that a "tobacco product manufacturer means an entity that after June 30, 1999, directly ... manufactures cigarettes...." In light of this statute, the trial court found that "the term 'manufacture' in the Qualifying Statute is vague and ambiguous, and therefore ripe for judicial construction." *Id.* at 62.

■■■ In resolving the OAG's challenges to this determination, we initially observe that the interpretation of a statute is a legal question that is reviewed de novo. *Golden Rule Ins. Co. v. McCarty,* 755 N.E.2d 1104, 1106–07 (Ind.Ct.App.2001). Moreover, we have held that

If a statute is unambiguous, we may not interpret it but must give the statute its clear and plain meaning; if a statute is ambiguous, we must ascertain the legislature's intent and interpret the statute to effectuate that intent. *Robinson v. Gazvoda,* 783 N.E.2d 1245, 1249–50 (Ind. Ct.App.2003), *trans. denied.* "A statute is ambiguous if it is susceptible to more than one reasonable and intelligible interpretation." *Id.* at 1250. If interpretation is necessary, the express language of the statute controls and the rules of statutory construction apply. *Bushong v. Williamson,* 790 N.E.2d 467, 471 (Ind. 2003). We are required to determine, give effect to, and implement the legislative intent underlying the statute and to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience. *Id.* "In so doing, we should consider the objects and purposes of the statute as well as the effects and repercussions of such an interpretation." *Id.* The legislative intent

governing the provision as a whole prevails over the strict literal meaning of any word or term. *Id.*

*Med. Assurance of Ind. v. McCarty*, 808 N.E.2d 737, 741 (Ind.Ct.App.2004).

■ We also note that when determining the plain and ordinary meaning of a statutory term, courts may use English language dictionaries and consider the relationship of the term with other words and phrases. *State v. Eilers*, 697 N.E.2d 969, 971 (Ind.Ct.App.1998). However, because words that have one meaning in a particular context frequently have a different significance in another, "it is necessary to consider the context of the words . . . to determine their significance." *U.S. v. Raynor*, 302 U.S. 540, 547–48, 58 S.Ct. 353, 82 L.Ed. 413 (1938). While a dictionary collects standard usages, it does not set limits on the scope of language: "Both the linguistic and functional contexts of words offer better clues to meaning than do dictionaries." *Pub. Hosp. of Salem v. Shalala*, 83 F.3d 175, 177 (7th Cir.1996). Courts that interpret words should not overemphasize a strict literal or selective reading of the words in question. *Area Interstate Trucking, Inc. v. Ind. State Dep't of Revenue*, 574 N.E.2d 311, 313 (Ind.Ct.App. 1991).

■ We also seek to give effect to every word and clause in a statute. *Combs v. Cook*, 238 Ind. 392, 397, 151 N.E.2d 144, 147 (1958). Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute, and we assume that the language set forth in a statute was used intentionally. *Robinson v. Wroblewski*, 704 N.E.2d 467, 475 (Ind. 1998).

Here, the OAG claims that a company, such as CTC, that has another company, such as HOPR, *intervening* by fabricating the cigarettes cannot come within the definition of TPM provided by the legislature. As a result, the OAG asserts that "directly manufactures" can only mean one who produces according to an organized plan and with a division of labor without anyone or anything intervening.

On the other hand, CTC argues that the trial court was justified in looking beyond a "mere dictionary" definition in concluding that it was the producer of Roger cigarettes. Appellee's Br. p. 30. In essence, CTC claims that Indiana statutes that actually define "manufacture" or "manufacturer" do so "far more broadly than would the [Attorney General.]" *Id.* at 32. Moreover, CTC argues that judicial opinions have been adopting increasingly broad definitions of "manufacturer" for nearly 100 years. *Id.* at 33. Thus, CTC contends that the trial court's determination that CTC was the manufacturer of Roger cigarettes was appropriate.

■ We initially observe that this Court will "give great weight" to an administrative agency's reasonable interpretation of a statute (1) when the interpreting agency is charged with the duty of enforcing the statute interpreted and (2) the interpretation is not inconsistent with the statute itself. *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind.2000). When determining whether an agency interpreting a statute has acted unreasonably in doing so, a trial court must consider a number of factors, including whether the decision was reached through a process that was arbitrary, capricious, without observance of required procedures, or was unsupported by substantial evidence. *Id.* An agency acts arbitrarily or capriciously if its action constitutes willful or unreasonable action without consideration and in disregard of the facts and circumstances of the case or without some basis that would lead a reasonable person to such action.

*Ind. Bd. of Pharmacy v. Crick,* 433 N.E.2d 32, 39 (Ind.Ct.App.1982).

We note that Indiana statutes that actually define "manufacture" or "manufacturer" do so far more broadly than the OAG suggests. For instance, our products liability statute defines "manufacturer" as a "a person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product or a component part of a product before the sale of the product to a user or consumer." Ind. Code § 34–6–2–77. Additionally, various judicial interpretations of "manufacture" have adopted increasingly broad definitions of the term.

In *Polaroid v. United States,* 235 F.2d 276 (1st Cir.1956), the issue was whether Polaroid—the company that invented and held product patents on a camera and its components—or Grist Manufacturing, which fabricated the camera pursuant to a contract with Polaroid, was the "manufacturer" of the camera and therefore responsible for paying an excise tax. The court determined that Polaroid, and not the entity that actually fabricated the cameras, was the manufacturer because Polaroid held the relevant patents, established manufacturing and production standards, determined the number of cameras to be made, affixed its trademark to all of the cameras, and generally "retain[ed] the upper hand" in its relationship with Grist. *Id.* at 277–78. Thus, Polaroid was obligated to pay the excise tax in question.

More recently, in *Torres v. Goodyear Tire & Rubber Co.,* 163 Ariz. 88, 786 P.2d 939 (1990), the plaintiffs were injured when the tread separated on a Goodyear tire. The tire in question had actually been produced by Goodyear Tire & Rubber (GY Britain) and designed by Goodyear International Technical Center, a division of Goodyear of Luxembourg (GY Luxembourg). In that case, the court de-

scribed the scope of Goodyear's control over the other corporations as follows:

Goodyear's actual ability to control [GY Britain's] production of tires is pervasive. Either directly, or indirectly through its subsidiaries, Goodyear has the ability to design the product, provide specifications for its manufacture and actual production of the tire. Goodyear has reserved the right to control the quality of all tires manufactured by [GY Britain]. It sets warranty policy and honors valid warranty claims on all tires bearing the Goodyear trademark, even though, as in this case, they are manufactured by a subsidiary.

Goodyear's ability to control [GY Britain] is not confined to power asserted indirectly through common directors and officers. Goodyear and [GY Britain] have entered into a licensing agreement that permits [GY Britain] to manufacture Goodyear tires. The licensing agreement provides that tires will be manufactured according to the formulas, specifications, and directions given by Goodyear, and produced from materials approved by Goodyear. [GY Britain] is also required to comply with Goodyear's instructions on labeling, marketing, packaging, and advertising the tires.

*Id.* at 942. It was further observed that

This court must also acknowledge the realities of the marketplace when it decides cases. The marketplace as described by the facts of this case, indicates very clearly that we deal with a tire designed to be a Goodyear tire, produced, packaged, advertised, and sold as a Goodyear tire, and warranted by Goodyear. To hold, as we are asked, that when the product is defective and unreasonably dangerous, it should not be considered a "Goodyear" tire but a "[GY Britain] tire" would be to espouse a doctrine that would no doubt surprise

most Goodyear customers, and perhaps some officers of Goodyear itself.

*Id.* at 944. In light of *Goodyear*, it is apparent that companies which control the manufacturing process—even if they did not physically produce the products in question—have been judicially determined to be manufacturers, even against their wishes.

In this case, the trial court looked beyond the OAG's preferred dictionary meaning in construing the term "directly manufactures" in reaching its conclusion. At the bench trial, the OAG's own expert witness, Gary Wilson, explained that companies that clearly fall outside of that same definition are "deemed" by NAAG to be manufacturers and are therefore permitted to sell cigarettes in Indiana. Tr. p. 476. Wilson explained that "[t]here have been a number of companies that have signed on and were deemed [by NAAG] to be tobacco products manufacturers even though they didn't meet the definition of the agreement." *Id.* at 479–80. Wilson further testified that

> I have no doubt in my own mind that a tobacco products manufacturer can lease a facility and lease equipment so that it doesn't own it in fee, but has total control of that equipment and use employees or persons that it has the control over—whether they are called employees under the law of that country—I don't know—but they have to be controlled by that entity and then it can be said directly to have manufactured the cigarettes.

*Id.* at 469. Finally, Wilson acknowledged that the MSA has been amended in such a manner as to permit companies that are no more than importers of cigarettes fabricated by others to be "deemed" manufacturers of cigarettes, by the simple device of their becoming a signatory to the MSA. *Id.* at 478.

The trial court also considered and reviewed a NAAG memorandum that was received by the OAG during the Summer of 2003, which documented a nationwide strategy by attorneys general as it related to NPMs, including CTC. Appellants' App. p. 642–47. The memo, which Orbison reviewed, contains the following passages with regard to NPMs:

> Increasing sales by NPMs will sharply reduce the next scheduled payments to all States under the MSA and under the four separate State agreements. States should prepare for receiving lower payments than previously anticipated.... These payments are net of reductions totaling about $2.5 billion caused by the Volume Adjustment applicable to all agreements. One of the principal contributors to this revenue loss is the accelerating increase in sales of cigarettes by NPMs.
>
> . . .
>
> These results underscore the urgency of all States taking steps to deal with the proliferation of NPM sales, including enactment of complementary legislation and allocable share legislation and consideration of other methods designed to serve the interest of the States in avoiding reductions in tobacco settlement payments.
>
> . . .
>
> [R]eductions in settlement payments resulting from the displacement of OPM sales by NPM sales confer no benefits on the States. Such displacement is occurring. At the same time that sales by Participating Manufacturers are shrinking, sales by Non–Participating Manufacturers, particularly imports, continue to grow and to reduce settlement payments to the States.

. . .

It should be stressed that NPM sales anywhere in the country hurt all States. All payment calculations are done on the basis of cigarette sales nationally. NPM sales in any state reduce payments to every other State. All States have an interest in reducing NPM sales in every State.

Appellants' App. p. 642–48.

In addition to the above, Orbison conceded that at least eight—and possibly nine—of the following factors favored a designation of CTC as the manufacturer of Roger cigarettes:

i. Who owns the brand or trademark?

ii. Who does the physical processing?

iii. Who pays the Federal Excise Tax?

iv. Who makes the actual shipment to wholesale?

v. Who owns the product formula?

vi. Who determines the amount of product to be produced?

vii. Who controls and pays for the advertising?

viii. Who is responsible for marketing the product?

ix. Who has title to the raw materials?

x. Whose name is on the package?

Prelim. Inj. Tr. p. 35–36.

In our view, the totality of the evidence presented at trial establishes that the OAG's decision to equate "manufacture" with "fabricate" for purposes of considering CTC's request for inclusion in the Directory was arbitrary and, therefore, unreasonable. Therefore, the trial court's determination that CTC was the "manufacturer" of Roger brand cigarettes was proper.

### IV. Declaratory Judgment

Finally, the OAG contends that even if the evidence was sufficient to support the trial court's decision with regard to the "manufacture" of cigarettes, the declaratory judgment was overly broad. More specifically, the OAG argues that the trial court "improperly decided a question that the [OAG] never had a chance to decide . . . that is, whether Roger brand should be listed on the Registry based on cigarette sales in 2003 or afterward." Appellant's Br. p. 41.

Notwithstanding this contention, we note that nowhere in the judgment was it declared that Roger cigarettes *must* be included in the Directory for 2003 or any year thereafter. Hence, the OAG has failed to demonstrate that the trial court invaded the province of the OAG to determine whether CTC should be included in the Directory. Indeed, the only decision that the trial court made that was applicable to sales in 2003 or any other year except for 2002 was that, based on the evidence before the trial court, "for all times prior to the filing of this lawsuit on August 28, 2003 . . . CTC was the tobacco product manufacturer of all such cigarettes, as the term is defined by Indiana's Qualifying Statute." Appellants' App. p. 29.

In our view, that determination did not usurp the OAG's right to approve or reject CTC's application for inclusion in the Directory based on sales. Inclusion in the Directory is based on a number of factors, and an applicant's failure to meet any of them may lead to its omission from the Directory. Indeed, the sole factor touched upon by the trial court's judgment concerned the question of whether CTC was the manufacturer of Roger brand cigarettes. As noted in the trial court's order:

The Defendants, and any persons acting or purporting to act on their behalf, are

permanently enjoined and prohibited from removing CTC and/or its Roger brand family of cigarettes from the Directory or its functional equivalent, if such removal is based in whole or in part on a determination that CTC was not the tobacco product manufacturer of such cigarettes for any period on or before August 28, 2003.

*Id.* When considering the above, it is apparent that the OAG may review each of CTC's annual applications for inclusion in the Directory, and it may reject those applications if appropriate. In other words, the only practical limitation placed on that review by the trial court's judgment is that CTC must be deemed the manufacturer of Roger cigarettes produced on or before August 28, 2003. Hence, the injunction prohibiting the OAG from basing its decision to exclude CTC from the Directory upon its determination that CTC is not the manufacturer of Roger cigarettes was proper.

The judgment of the trial court is affirmed.

BAILEY, J., and VAIDIK, J., concur.