PRESS–A–DENT, INC., Appellant–
Plaintiff,

v.

Danny D. WEIGEL, Appellee–
Defendant.

No. 02A03–0504–CV–195.

Court of Appeals of Indiana.

June 21, 2006.

**663**

Cathleen M. Shrader, Barrett & McNagny LLP, Fort Wayne, IN, Attorney for Appellant.

Diana C. Bauer, Carson Boxberger LLP, Fort Wayne, IN, Attorney for Appellee.

**OPINION**

BAKER, Judge.

Appellant-plaintiff Press–A–Dent, Inc. (Press–A–Dent), appeals the judgment entered in favor of the appellee-defendant Danny D. Weigel, claiming that the trial court erroneously determined that Press–A–Dent had no protectible interest in its business to support the non-compete and non-solicitation covenants that Weigel allegedly breached pursuant to an employment agreement that the parties executed. Hence, Press–A–Dent argues that the trial court erred in denying its claims for breach of contract against Weigel. Press–A–Dent also maintains that the trial court erred in denying its request for liquidated damages as specified in the agreement. Concluding that Press–A–Dent failed to establish that it had any legally protectible interest in its business following Weigel's alleged breach of the covenants set forth in the agreement, and further finding that Press–A–Dent's claim for liquidated damages was properly denied, we affirm the judgment of the trial court.

*FACTS*

From 1980 through 1993, Weigel and Jeffrey Weston worked together at the North American Van Lines Company (NAVL) in Fort Wayne. Weston left his employment with NAVL at some point, and had become an independent contractor for Richard Buckley, who had started an automobile paintless dent removal company by the name of "Press–A–Dent." Buckley trained Weston to perform dent removal work for automobile dealerships, individuals, and other clients. However, in 1992, Weston terminated his relationship with Buckley and went into business for himself as "Papa Dent."

Weston approached Weigel about becoming involved in the business, and Weston promised to provide the training if Weigel was interested. Weston also told Weigel that he was earning nearly $800 per day in the business. Initially, Weston did not inform Weigel that he was subject to a non-competition agreement with Buckley and Press–A–Dent that prohibited him from performing his services in Fort Wayne. He also did not tell Weigel that Buckley actually was the owner of the paintless dent removal process.

On April 10, 1993, Weigel and Weston entered into an agreement (the Weigel Agreement), whereby Weston signed as the co-owner of Papa Dent. The Weigel Agreement provided that Weston was to perform various duties such as receiving payments from the company's customers, providing bookkeeping services, paying commissions, providing invoices, and paying mid-month draws. Specifically, the Weigel Agreement provided as follows:

*Section 12. Non–Disclosure and Non–Competition Provisions and Considerations.*

  A.  Non–Disclosure

      3.  Contractor ... agrees that ... for two years after the termi-

nation ... (i) he shall keep the knowledge and expertise which he learned to perform the Process ... confidential.

B. Non–Solicitation

During the term of this Agreement and for a period of two (2) years after the termination of this Agreement, Contractor covenants and agrees that he shall not ...

(i) perform any type of paintless dent services ... for any Customer of Weston ...

For purposes of this paragraph, a "Customer of Weston" means any person, corporation or entity for or to whom any employee or Independent contractor of Papa Dent, Inc. performed paintless dent services during the term of this Agreement.

C. Non–Competition Covenant

During the term of this Agreement and for a period of two (2) years after termination of this Agreement, and within and limited to the "Geographical Area" (defined below), Contractor covenants and agrees that he shall not ... engage in ... any business of any kind ... that is in competition with Weston in any way or form in the business of paintless dent services that are similar to the Process.

. . .

E. Liquidated Damages

1. Contractor ... agrees that in the event Contractor violates or breaches the provisions of Section 12(A), (B), or (C), Weston will suffer irreparable harm and it may be difficult to determine the exact amount of damages sustained by Weston.

2. If Contractor violates or breaches the provisions of Section 12(A), (B), or (C), Contrac-

tor agrees to pay Weston, as liquidated damages, the sum of Fifty Thousand dollars ($50,-000.00).

*Section 16. Termination.* Weston, in his sole discretion and with or without cause, may terminate this Agreement upon giving to Contractor thirty (30) days notice of termination.

. . .

Contractor, in his sole discretion and with or without cause, may terminate this Agreement upon giving to Weston thirty (30) days written notice of termination.

*Section 17. Miscellaneous*

E. *Heirs, Successors and Assigns.*

. . .

Weston may, without the consent of Contractor, freely assign this Agreement and all his right, title and interest in this Agreement.

Appellant's App. p. 407–12.

Weigel and Weston then executed an Equipment Lease, whereby Weston was to lease to Weigel a complete set of paintless dent removal tools, the use of Papa Dent's paintless process, and the company telephone line and answering service. Weigel agreed to pay Weston $200 per month in exchange for these services. Weston provided training to Weigel, which consisted of viewing a video tape, and observing Weston perform paintless dent removal for four weeks.

After receiving the paintless process training, Weigel was paid in accordance with a commission schedule under the Agreement. In 1994—his first full year of performing the paintless process—Weigel made over four times the amount of what he earned when he left NAVL. In 1997, Weigel's adjusted gross income amounted to $83,925.

In January 1994, Buckley filed a lawsuit against Weston, alleging that Weston misappropriated his paintless process, which was a trade secret. The trial court ultimately found Weston liable for his actions, and awarded Buckley damages equal to the profits that Weston made in the amount of $271,780.07.[1] The trial court's order also enjoined Weston and Weigel from performing any dent removal services until they could demonstrate that they had acquired a legitimate, alternative paintless process. In response to the order, Weston provided additional paintless process training for Weigel at Pro Dent in Plano, Texas. The cost of this training was approximately $2,000. Thereafter, the injunctions were dissolved, and Weigel was free to continue to perform the paintless process work for Weston.

On November 7, 1994, Weston sent Weigel a letter stating that all future commissions would be paid in accordance with a revised addendum to the original agreement. Although Weigel's territory was expanded, Weigel was to receive a lesser amount for his work, and Weston was to be paid a higher amount. Although Weigel maintained that he never agreed to such a revised payment schedule, and he could terminate their agreement at any time, Weigel operated in accordance with the revised commission schedule because the dent removal business was so lucrative.

On November 29, 1995, approximately two months after the monetary judgment had been entered in Buckley's favor, Weston assigned the Weigel Agreement to "The Dent Man, Inc.," for $10,000. This business was a newly formed Indiana corporation with Mary Rose as its President. Rose was Weston's girlfriend at the time, and they eventually married. Following the assignment, Weigel continued to perform the paintless process for The Dent Man in accordance with the revised addendum, and he continued making revenue and lease payments to that corporation.

On June 10, 1996, Buckley sued Weston, Rose, Weston's legal counsel, and Weigel, asserting that the Weigel Agreement constituted a fraudulent conveyance. Buckley also initiated litigation against Rose and The Dent Man to recover such transfers. On February 7, 1997, Weston petitioned for bankruptcy, and Buckley subsequently filed an objection to Weston's claim for discharge. Buckley objected on the grounds that Weston had concealed some property and misappropriated his trade secrets. The bankruptcy court ultimately determined that Weston was not entitled to discharge because his records were inadequate.

Thereafter, on October 3, 1997, Buckley filed an additional proceeding in the bankruptcy matter against Weston, Weston's bankruptcy trustee, Rose, the Dent Man, and Weston's legal counsel. The bankruptcy trustee filed a cross-claim against Rose and The Dent Man regarding the conveyance of assets to Rose and The Dent Man. The Trustee alleged that Weston had wrongfully transferred the business assets of Papa Dent, Inc., which assets produced income for Rose.

During the course of the bankruptcy proceedings, Weigel received no information or direction regarding the disposition of the rents and revenues he received. Hence, Weigel continued to send these amounts to Rose and The Dent Man through May 1999. However, on March 31, 1999, Weigel wrote Rose a letter regarding his commission payments under

---

**1.** On March 19, 1997, this court affirmed the trial court's determination that Weston had misappropriated Buckley's trade secret. *Wes-* *ton v. Buckley,* 677 N.E.2d 1089 (Ind.Ct.App. 1997).

the revised addendum. Specifically, Weigel requested that his commission payments be returned to their original percentages, and he inquired about the possibility of buying out his contract, citing an increase in the number of "self-owned" dent men who were able to perform services at a lower cost. In response, Rose indicated that she would not restructure the commission schedule. Rose also indicated that she would not permit Weigel to buy out his contract, citing the litigation between The Dent Man and Buckley.

On May 27, 1999, Weigel wrote another letter to Rose, The Dent Man, Weston, and Papa Dent, terminating the Weigel Agreement. In the letter, Weigel stated that the existing contract was "terminated, made unenforceable, and void by operation of law, as well as, your unilateral actions to modify terms without Dan's agreement." Appellant's App. p. 430–31. Weigel also indicated that he had recently completed an intensive in-service training in dent removal using a different process. Weigel stated that he had purchased all necessary tools needed to apply his skills, and further indicated that he had been "his own business for several years and paying unjustified percentages to you for no assistance at all." Appellant's App. p. 431. Weigel also contended that the non-compete provision in the original agreement was void as a matter of law. Hence, Weigel refused to make any additional payments to Weston, Rose, or The Dent Man. During the first two months after the contract was terminated, Weigel serviced eighteen car dealerships, an insurance company, a glass company, and six individual customers, generating approximately $33,000 in revenue. All of the customers on Weigel's first day of work were those for whom he had provided services while working for The Dent Man.

On June 8, 1999, Weigel's attorney received a letter from Rose and The Dent Man's legal counsel. This correspondence indicated that the attorney was not representing Weston or any of his previous business entities, which would include Papa Dent. Moreover, the attorney stated his opinion that Rose and The Dent Man believed that the Weigel Agreement was enforceable, and that, if necessary, "The Dent Man, Inc. is ready, willing and able to pursue the damage and injunction remedies contained in the Agreement, which ... is an agreement with an independent contractor, not an employee." *Id.* at 432. Finally, the letter indicated that the sale of Papa Dent's assets to The Dent Man, which would have included the Weigel Agreement, was the subject of litigation brought by Buckley to set aside the sale and reclaim assets of Papa Dent for the benefit of Weston's creditors.

Despite these representations, neither The Dent Man nor Rose pursued any action against Weigel. Moreover, it was established that Weigel had no involvement with Weston in the business since 1995. Also, after Rose acquired the Weigel Agreement, she never offered Weigel any marketing or additional experience in the paintless process. And neither Rose nor Weston had provided Weigel with any clients in 1996 or at any time thereafter. Weston did not enter into any other contract with subsequent independent contractors and/or employees in an attempt to continue the paintless dent removal business after May 1999. In essence, The Dent Man conducted no business following Weigel's termination in May 1999. No claim of a violation of any covenant was ever made or communicated to Weigel during the relevant period in the Agreement, and no one made a demand upon Weigel to perform the obligations of the Agreement during the period of the two

years that the non-compete clause was in effect.

On May 3, 2002, nearly three years after Weigel had terminated his agreement with The Dent Man and Rose, the parties to the bankruptcy trustee's cross-claim in the Florida bankruptcy proceeding reached a settlement. As part of this agreement, The Dent Man assigned the Weigel Agreement to the trustee in bankruptcy. The bankruptcy trustee assigned no value to The Dent Man, other than the Agreement. In particular, no value was assigned to The Dent Man's customers, the dent removal process, its stock, or its goodwill.

Thereafter, both Buckley and Weigel placed bids on the Weigel Agreement. In the end, Press–A–Dent acquired the Weigel Agreement, and paid the bankruptcy trustee $41,000. On July 3, 2000, a trustee's bill of sale sold the Weigel Agreement to Press–A–Dent.

On September 23, 2002, Press–A–Dent filed suit against Weigel, seeking injunctive relief and damages regarding the gross profits that Weigel had received from the business.

A bench trial on Press–A–Dent's claims was conducted on March 15 and 16, 2005. In granting judgment for Weigel, the trial court entered specific findings of fact and conclusions of law, determining that Press–A–Dent had no protectible interest sufficient to permit enforcement of the restrictive covenants. The trial court determined that Press–A–Dent failed to mitigate its damages or take any other action following Weigel's termination. Moreover, the trial court concluded that Press–A–Dent had failed to prove any damages, and it could not enforce the liquidated damages provision of the Weigel Agreement providing for repayment of training costs because that portion of the contract amounted to a penalty.

The trial court noted that The Dent Man chose to discontinue its operations and did not attempt to find replacement technicians once Weigel terminated his relationship with the company. Moreover, The Dent Man made no effort to enforce the restrictive covenants, or even notify Weigel that he was in violation of the non-compete clause. Thus, the trial court reasoned that The Dent Man could "not now step forward and assert that its good will was a protectible interest that was somehow harmed." Appellant's Br. p. 61. Hence, because "there was no good will to protect, no on-going business and no attempt by The Dent Man, Inc. to continue in business, there was no legitimate, protectible interest." *Id.* Thus, the trial court determined that "The Dent Man, Inc. cannot stand idly by for three years and then assert a claim for the disgorgement of all Weigle's profits." *Id.*

With respect to the gross profits that Weigel received, the trial court determined that Press–A–Dent presented no evidence suggesting that it would have had that volume of business but for Weigel's solicitation of customers. In essence, the trial court determined that Press–A–Dent failed to carry its burden of demonstrating that its alleged loss was attributable to Weigel's competition. Hence, the trial court concluded that The Dent Man failed to mitigate its damages.

Finally, the trial court determined that Press–A–Dent was not entitled to $50,000 in liquidated damages for the costs that The Dent Man incurred in training Weigel. It determined that the liquidated damages provision in the contract was not a suitable remedy for the reimbursement of training expenses because the amount necessary to reimburse The Dent Man from any money spent training Weigel was an easily ascertainable amount. Specifically, the trial court reasoned that The Dent Man merely

had to present its receipts for Weigel's training and the cost of the steel purchased at the junkyard that Weigel used to manufacture his materials. In essence, it was determined that $50,000 bore no reasonable relation to the damage that The Dent Man was likely to suffer as a result of any breach by Weigel. Moreover, the trial court noted that no evidence was presented that Weston spent $50,000 on Weigel's training or the tools that were provided for him to use. In fact, it was observed that the unrebutted testimony established that the steel was obtained from a junkyard and that Weigel crafted his own tools. Moreover, the trial court observed that Weigel's training in Texas cost under $2,000. Thus, the trial court determined that the liquidated damages provision was intended to penalize Weigel for breaching the Agreement, rather than serving as compensation. Press–A–Dent now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

We first note that when the trial court enters specific findings of fact and conclusions of law with respect to a final judgment, we apply a two-tiered standard of review. First, we address whether the evidence supports the findings, and then whether the findings support the judgment. *Learman v. Auto Owners Ins. Co.*, 769 N.E.2d 1171, 1174 (Ind.Ct.App.2002), *trans. denied.* The trial court's findings and conclusions will be set aside only if they are clearly erroneous—when the record contains no facts or inferences supporting them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment.

*Clark v. Crowe,* 778 N.E.2d 835, 839–40 (Ind.Ct.App.2002).

We also note that Press–A–Dent is appealing from a negative judgment. Thus, it must demonstrate that the trial court's judgment is contrary to law. A judgment is contrary to law only if the evidence in the record, along with all reasonable inferences, is without conflict and leads unerringly to a conclusion opposite that reached by the trial court. In conducting our review, we cannot reweigh the evidence or judge the credibility of any witness, and must affirm the trial court's decision if the record contains any supporting evidence or inferences. *Infinity Prods., Inc. v. Quandt,* 810 N.E.2d 1028, 1031 (Ind.2004). To the extent that the judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment. *Lasater v. Lasater,* 809 N.E.2d 380, 397 (Ind.Ct.App.2004).

### II. Press–A–Dent's Claims

#### A. Damages for Breach

Press–A–Dent argues that the judgment was erroneous because the trial court erred in determining that the company had no protectible interest to support the non-compete and non-solicitation covenants that Weigel breached. In essence, Press–A–Dent contends that the trial court based that determination solely upon the company's post-breach activities and that the trial court erroneously based its judgment on Press–A–Dent's failure to mitigate damages.

We first note that agreements involving covenants not to compete are in restraint of trade and are not favored by the law. *Harvest Ins. Agency v. Inter-Ocean Ins. Co.,* 492 N.E.2d 686, 688 (Ind. 1986). Non-competition agreements are

strictly construed against the employer and are to be enforced only if reasonable with respect to the legitimate interest of the employer, restrictions on the employee, and the public interest. *Id.* The reasonableness of restrictive covenants is a question of law that rest upon facts gleaned from the totality of the circumstances. *Ackerman v. Kimball Int'l, Inc.,* 652 N.E.2d 507, 509 (Ind.1995). In *Ackerman,* our Supreme Court recognized that:

> Such covenants are deemed reasonable only where the restraint is reasonably necessary to protect the employer, is not unreasonably restrictive of the employee and is not against public policy. [Citation omitted]. The determination of the reasonableness of the restraint focuses on the legitimate interests of the employer which might be protected and the protection granted by the covenant in terms of time, space and types of activity proscribed.
>
> . . .
>
> The test of the validity of a non-competition covenant is dependent not merely upon the covenant itself but upon the entire contract and the situation to which it is related.

*Id.* at 509. Additionally, covenants not to compete are valid when they protect an employer's interest and confidential information and/or the good will generated between a customer and a business. *Pathfinder Commc'ns Corp. v. Macy,* 795 N.E.2d 1103, 1110 (Ind.Ct.App.2003); see also *Unger v. FFW Corp.,* 771 N.E.2d 1240, 1244 (Ind.Ct.App.2002) (recognizing that an employer is entitled to contract to protect the good will of the business, which includes secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact). By the same token, an employer must have an interest that it legitimately is trying to protect. *Norlund v. Faust,* 675 N.E.2d 1142, 1154 (Ind.Ct.App.1997), *trans. denied.*

We further note that the assignee of a contract takes an assignor's rights and becomes subject to the same obligations. *Porter v. Bankers Trust Co. of Cal., N.A.,* 773 N.E.2d 901, 905 (Ind.Ct.App.2002). In other words, an assignee stands in the shoes of the assignor. *Pettit v. Pettit,* 626 N.E.2d 444, 447 (Ind.1993).

In this case, the evidence established that shortly after the Weigel Agreement with Weston was assigned to The Dent Man in 1995, Weston left Indiana and moved to Florida. Appellant's App. p. 299. The undisputed evidence also demonstrated that there were no employees of The Dent Man, and the company did not market any services in Indiana. *Id.* at 431. Moreover, the president of The Dent Man never provided Weigel with clients or customers under the assigned Agreement in 1996 or at any time thereafter. *Id.* at 299, 334. Neither The Dent Man nor Rose entered into any contracts with other independent contractors, and The Dent Man essentially ceased all operations when Weigel terminated the Agreement.

Press–A–Dent did not present any evidence to the contrary, and there was no evidence that The Dent Man had any paintless process customers at any time after the November 29, 1995, assignment of the Weigel Agreement, or any time thereafter. In light of these circumstances, it was reasonable for the trial court to conclude that there was no protectible good will in the company. Hence, Press–A–Dent established no damages as the result of Weigel's alleged breach of the Agreement.

Notwithstanding Press–A–Dent's failure to show a protectible interest in its business, the undisputed evidence also demonstrated that neither The Dent Man nor

Rose took any action to enforce the non-competition provision during the two years that it was arguably in effect. In fact, despite the letter that The Dent Man sent to Weigel on June 8, 1999, stating that it was "ready, willing and able" to pursue legal action against him, no action was taken. *Id.* at 296.

We also note that even though the Weigel Agreement was subject to the bankruptcy litigation, neither The Dent Man nor Rose filed for bankruptcy. Weston filed for personal bankruptcy on February 7, 1997, and if he still owned the Weigel Agreement at that time, it may have been considered an asset of the bankruptcy estate. However, as set forth above, the undisputed evidence is that Weston assigned the Weigel Agreement to The Dent Man on November 29, 1995. As a result, it was not property of Weston's bankruptcy estate. The Trustee in Bankruptcy did not obtain the Weigel Agreement from The Dent Man until May 3, 2002—long after any non-competition provision had expired.

In considering these circumstances, we find that it was proper for the trial court to conclude that Press–A–Dent failed to satisfy its burden of proof in establishing that it had a legitimate protectible interest in good will by the time that Weigel terminated his Agreement. Inasmuch as the evidence established that The Dent Man had completely ceased its business operations and chose not to hire replacements for Weigel or contract with other customers, we agree with the trial court's conclusion that The Dent Man could not assert a claim for damages as a result of Weigel's alleged breach after it essentially did nothing for three years.

### B. Liquidated Damages

■ In a related issue, Press–A–Dent contends that the trial court erred in denying its claim for $50,000 in liquidated damages provided for in the Weigel Agreement. Specifically, Press–A–Dent argues that even if the actual damages that it suffered could not be calculated with any degree of reasonable certainty, Press–A–Dent could recover the liquidated damages specified in the contract.

■ In Indiana, we have enforced provisions within contracts that provide for liquidated damages. *Gershin v. Demming,* 685 N.E.2d 1125, 1128 (Ind.Ct.App. 1997). However, where the liquidated damages are "grossly disproportionate to the loss which may result from the breach or [are] unconscionably in excess of the loss sought to be asserted, [we] will treat the sum as a[n] [unenforceable] penalty rather than as liquidated damages." *Czeck v. Van Helsland,* 143 Ind.App. 460, 241 N.E.2d 272, 274 (1968). Moreover, the question of whether a contract provision provides for liquidated damages or for an unenforceable penalty is a question of law for the court. *Id.* In determining whether a contract provision constitutes liquidated damages or an unenforceable penalty, we consider the facts, the intention of the parties, and the reasonableness of the stipulation under the circumstances of the case. *Gershin,* 685 N.E.2d at 1128. Thus, even though the question is one of law, it may require resolution of underlying factual issues. *Art Country Squire, LLC v. Inland Mortg. Corp.,* 745 N.E.2d 885, 891 (Ind.Ct.App.2001).

In this case, we have already determined that The Dent Man essentially ceased operating after May 1999. And it never demanded that Weigel stop his operations. Inasmuch as there was no ongoing business and there was no good will to protect, The Dent Man failed to show that it sustained *any* damages as a result of Weigel's actions. Moreover, the evidence showed that Weigel received training from Weston on the paintless process in the

form of watching a videotape and observing Weston perform the process. Appellant's App. p. 70, 244, 250. The uncontradicted testimony showed that Weigel's subsequent training costs amounted to less than $2,000. Additionally, receipts could have been submitted to ascertain the cost of the junkyard steel that was used to craft Weigel's tools once he went into business for himself. Simply put, the trial court could have considered these amounts as a component of Press–A–Dent's claim for damages, had they been offered at trial, and damages could have been calculated with reasonable certainty. Hence, we can only conclude that the liquidated damages provided for in the Weigel Agreement amounted to nothing more than a penalty. As a result, the trial court properly denied The Dent Man's claim for liquidated damages.

The judgment of the trial court is affirmed.

MAY, J., concurs.

SULLIVAN, J., concurs in result.