## FOR PUBLICATION



FILED
Oct 07 2013, 6:12 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**SARA R. BLEVINS**
**JAMES E. ZOCCOLA**
Lewis & Kappes, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**GREGG S. THEOBALD**
Lafayette, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

DANIEL B. BUFFKIN,                  )
                                    )
    Appellant-Defendant,        )
                                    )
        vs.                 )     No. 79A02-1302-PL-141
                                    )
GLACIER GROUP,                      )
                                    )
    Appellee-Plaintiff.         )

---

APPEAL FROM THE TIPPECANOE CIRCUIT COURT
The Honorable Donald L. Daniel, Judge
Cause No. 79C01-1211-PL-41

---

**October 7, 2013**


**OPINION - FOR PUBLICATION**


**BROWN, Judge**

Daniel B. Buffkin appeals from the trial court's Findings of Fact and Conclusions of Law Granting Preliminary Injunction, and raises one issue, which we revise and restate as whether the court's ruling is clearly erroneous. We reverse and remand.

FACTS AND PROCEDURAL HISTORY

As an independent contractor, Buffkin began working as a "sales recruiter" for Glacier Group ("Glacier") in August 2008. Transcript at 6. Glacier provides executive or employee recruiting and placement services in the field of information technology ("IT"). Buffkin and Glacier, by its President Eric Hilleboe, signed an Independent Contractor Agreement dated August 12, 2008 (the "Agreement"). The Agreement provided in part:

> 1. Description of Work. The work provided by Contractor [Buffkin] is employee recruitment and performance placement for customers and clients of [Glacier]. During the term of this agreement and for the period of time set forth herein, [Buffkin] agrees to perform employee recruitment and performance placement services for only [Glacier] and agrees not to provide such services to any third party without the prior written consent of the [Glacier].
>
> 2. Independent Contractor Relationship. [Buffkin] is an independent contractor and is not an employee of [Glacier]. [Glacier] shall determine the work to be done by [Buffkin], but the manner in which he renders such services to [Glacier] shall be within the sole control and discretion of [Buffkin], . . . . [Buffkin] shall be responsible for all taxes as mandated by law. Since [Buffkin] is not an employee, [he] is not eligible for nor shall he be entitled to receive, any benefits which employees of [Glacier] are entitled to receive and shall not be entitled to workers' compensation, unemployment compensation, medical insurance, life insurance, paid vacations, paid holidays, pension, profit sharing, or Social Security on account of the work performed by [Buffkin] under this agreement.
>
> 3. Duration of Agreement. This agreement is effective as of the date it is signed by both parties ("effective date") and shall continue in effect until cancelled by either party upon thirty (30) days' written notice to the other party.

2

4.      Terms of Payment.  During the term of this agreement, in full compensation for his services, [Buffkin] shall be paid by [Glacier] an amount equal to __20__ percent (__20__%) of any fees collected by or paid to [Glacier] resulting from placements originated by [Buffkin].  [Buffkin] has been advised that fees paid to [Glacier] by its customers and clients are not the same and that, as a result, the payments to [Buffkin] will differ.  [Buffkin] shall not be entitled to payment for any fees collected by or paid to [Glacier] resulting from placements originated by Eric Hilleboe or from any other placements not originated by [Buffkin]. . . .

5.      Trade Secrets and Confidentiality.  While during the term of this agreement or at any time thereafter, regardless of expiration or termination of this agreement, [Buffkin] agrees not to disclose, directly or indirectly, to any person or entity any trade secrets or protected information of [Glacier]. . . . Upon termination or expiration of this agreement, [Buffkin] agrees not to solicit, entice away or divert any current or past customers of [Glacier] nor any persons or entities contacted by [Buffkin] while performing services for [Glacier] during the term of this agreement. . . .

6.      Covenant not to Compete.  Throughout the term of this agreement and for a period of three (3) years immediately following the expiration or termination of this agreement, [Buffkin] shall not, directly or indirectly, whether for compensation or otherwise, either individually, or as an employee, employer, consultant, agent, principal, partner, corporate officer, director, stockholder or in any other individual or representative capacity, enter into, own, manage, engage in, be employed by, operate, participate in, control, aid, assist, or be connected in any way with any business that competes with [Glacier] in employee recruitment or performance placement with employers with offices in the continental United States.  [Buffkin] acknowledges and agrees that [Glacier's] client base is drawn from throughout the country in which competition is restricted by this provision and that such restricted area and the length of such restriction on competition is reasonable.   This restriction on competition shall be construed as an agreement independent of any other provision of this agreement and the existence of any claim or cause of action by [Buffkin] against [Glacier], whether based on this agreement or otherwise, shall not constitute a defense to the enforcement of this covenant by [Glacier].  In the event of a breach of this paragraph by [Buffkin], [Glacier] shall be entitled to injunctive relief as well as all other remedies available under this agreement and the law.  In addition to any other remedies available under the law to [Glacier] for a breach by [Buffkin], as liquidated damages, and not as a penalty, [Buffkin] shall pay to [Glacier], sixty percent (60%) of the gross fees or payments made to [Buffkin] for employee recruitment or

3

performance placement services.  In addition, the period of non-competition by [Buffkin] shall be extended by the length of the period of any such breach.

\* \* \* \* \*

9.     Attorney Fees, Costs.  In the event either party shall reasonably be compelled to employ an attorney to enforce the provisions of this agreement, the non-defaulting party shall be entitled to reasonable attorney fees and all costs and expenses thereby incurred, including trial and appeal.

Appellant's Appendix at 85-87.

On June 2, 2011, Eric Hilleboe, the President/CEO of Glacier, sent an e-mail message to Buffkin stating that Glacier was terminating the Agreement effective as of that date.

On November 16, 2012, Glacier filed a complaint against Buffkin alleging that he was in breach of Paragraph 6 of the Agreement and requesting damages and injunctive relief.  On December 6, 2012, Buffkin filed an answer and a counterclaim alleging that Glacier failed to comply with the termination provision of the Agreement.  Glacier filed an answer on December 13, 2012, and on December 26, 2012, filed a motion to amend the complaint to correctly reflect its name as a partnership, and the court granted the motion.

On January 8, 2013, the court held a hearing at which the parties presented evidence and arguments, and then took the matter under advisement and directed counsel to submit proposed findings within two weeks.  At the hearing, Hilleboe testified that Glacier "do[es] executive recruiting in the IT . . . Sector for companies related to Data Storage, hosting, location, virtualization, manage services," that its office is located in West Lafayette, Tippecanoe County, Indiana, and that it does "executive recruiting in

4

[the IT] field for primarily sales people, pre-sales engineers, systems engineers, inside sales, leadership positions being directors VP's, CFO's, CEO's those types of positions." Transcript at 4. When asked if he was essentially a "head hunter in the IT field," Hilleboe testified "Yeah so basically we have a probably forty-five active clients that request our services in providing sales people or pre-sales engineers to those companies so what we do is we go out to competitors of those companies and we try and find individual sales people that might be a fit based on having . . . skills that qualification matches." Id. at 4-5. Hilleboe testified that Buffkin was hired to be a sales recruiter, that Glacier would provide him with job openings for its particular clients, and that Buffkin would then look for individuals with the skill requirements to be candidates to fill the clients' positions.

Hilleboe further testified that he had numerous conversations with Buffkin about Buffkin's performance, that his performance "from January of 2011 to June of 2011 when he was let go was basically non-existent," and that "he had assisted in placing one individual candidate in that six month time frame." Id. at 8. Hilleboe stated that when Buffkin began to work for Glacier, he had no recruiting or IT experience and that Glacier "taught him everything that he knows about how to recruit, who to recruit, when to recruit them, what language to use, how the contracts were written and not only that he was privy and had access to what is called proprietary information from our clients that basically relate to things such as commissions, commissions structures, payouts, products and services of those organizations that we recruit for." Id. at 11. Glacier presented a client list identifying its clients during Buffkin's tenure of 2008 to 2011 and identifying

5

additional clients Glacier acquired after the termination of the Agreement.[1]  In addition, Hilleboe testified that, on November 15, 2011, he went to a website which advertised for job openings and discovered that Buffkin was advertising for jobs in the IT field, including for "data storage, hosting virtualization." Id. at 14.  Hilleboe testified that Glacier did recruiting nationwide and primarily in metropolitan cities.  When asked if he was requesting "a preliminary injunction to prevent [] Buffkin from engaging in IT recruiting during the pendency of this litigation," Hilleboe stated "IT recruiting as it relates to data storage, virtualization, hosting, co-location, data analytics, big storage." Id. at 19.

Buffkin testified that he placed candidates for Glacier in the areas of sales representatives and sales engineers and to his knowledge did not place any other types of individuals in the IT industry.  Buffkin indicated that Glacier had other independent contractors like him that did work in other parts of the country.  He stated that he did not have any contact with any of Glacier's clients or their representatives and that Glacier did not provide him with a client list or any contact information for the clients.  Buffkin testified: "my role with Glacier Group was simply [to] provide them candidates.  I have no knowledge of, no communication with any companies, was not allowed to have communication with any companies so my simple role was to find candidates with the specific skill set and get them over to Eric [Hilleboe] and his partner." Id. at 42.  He

---

[1] Under the heading "Storage / Cloud / Big Data / Virtualization Companies – During [Buffkin's] Tenure," the list identified the names of thirty-seven companies.  Exhibit B.  Under the heading "Storage / Cloud / Big Data / Virtualization Companies – Acquired after [Buffkin's] Tenure," the list identified the names of eleven companies.  Id.  Under the heading "HOSTING / VIRTUALIZATION / DATA CENTER / CLOUD COMPUTING / COLOCATION / IT / Network Services Telecom COMPANIES During [Buffkin's] Tenure," the list identified the names of thirty-three companies.  Id.

stated that there was not any sort of formal training and that he never visited the Glacier office. Buffkin testified that "Glacier Group would have a skills set that they were looking for with respect to the companies" and that "[t]he only information would be you would share a job description with me. A comp range of what the job might pay but that is it. And I would find a person with that specific skill set related job description and get them over to the Glacier Group." Id. at 43. When asked, "[d]uring the period of August 12 of 08 through June 2nd of 2011 how many deals . . . prospects did you bring to the Glacier Group that actually closed," Buffkin stated "[i]t wasn't really a whole lot but I guess fifteen." Id. at 43-44.

When asked if he recalled any of the clients that he may have been aware of during his time at Glacier, Buffkin replied "[y]eah when he would provide me with a job description and a role and then he would mention the company so yeah I knew the companies or at least a general idea of the companies that he was recruiting for." Id. at 44. Buffkin further testified that he never made any contact with any of Glacier's customers at any time after the Agreement was terminated. When asked if he had "done some executive placement" since his dismissal in June 2011, Buffkin responded affirmatively, and when asked "about how many deals [had he] done," Buffkin stated "[n]ineteen or so." Id. at 45. Buffkin indicated that to his knowledge not one of the placements was with a client of Glacier. He stated that he never discussed any confidential information of Glacier with anyone, that there were "no trade secrets or proprietary information exchanged with my relationship with Glacier Group," and that "[i]t was a recruiting form and we didn't have any customer list, client list, there was no

7

information that was ever exchanged that I would consider to be proprietary." Id. at 46. Buffkin stated he was asking the court to find the non-compete clause of the Agreement to be unenforceable as overly broad because it did not have any parameters of industry whatsoever, and it sought to prohibit him from doing any executive recruiting in any industry. He further indicated that the highest number of deals he may have done with Glacier was fifteen and potentially in fifteen different states but that was unlikely as he may have done multiple deals in the same state. When asked, of the prospects or candidates he communicated with while working for Glacier, how many he had contact with after June 2011, Buffkin responded: "No idea. I couldn't put a number on those people. I have done everything in my capacity to not contact anybody that I ever had any contact with while at Glacier Group." Id. at 49. He indicated that a majority of the nineteen transactions he did since he left Glacier dealt with IT or data storage. When asked, "[a]s you sit here today are you recruiting in the IT industry," Buffkin responded affirmatively, and he indicated that he also recruited in the "data storage virtualization and data center and hosting industry." Id. at 51. When asked about the companies he was recruiting for, Buffkin named four companies, and when asked if any of those companies were competitors of Glacier, Buffkin stated "they are not." Id. at 52. When asked "[a]ny of the prospects that you contacted to fill positions of Glacier Group did that have anything to do with any of that information that Eric or anybody at Glacier Group provided you," Buffkin answered "No," and when asked whether any prospects he had contacted since his termination by Glacier had anything to do with any information provided by Glacier, Buffkin answered "No." Id. at 52. When asked "[s]o the[y] are just

individuals that are out there in the tech sector in in the business sector," Buffkin responded affirmatively. Id.

On March 7, 2013, the court issued Findings of Fact and Conclusions of Law Granting Preliminary Injunction. In the order, the court found in part that "Glacier Group is in the business of recruiting in the field of information technology, data storage, cloud, virtualization, big data and managed hosting, managed services, data communication, and telecommunication" and that its "clients and candidate base are located throughout the United States." Appellant's Appendix at 5. The court found that "under [Buffkin's] own admission, after being terminated by [Glacier] on June 2, 2011, [he] has engaged in and continues to engage in recruitment and/or advertisement for and/or performance placement of candidates for placement in the industry in which [Glacier] operates – recruiting and performance placement of prospective employees in the areas of data storage, cloud, virtualization, big data, managed hosting, managed services, data communication and/or telecommunication." Id. at 7. In its conclusions of law, the court stated the goodwill generated between Glacier and its customers, together with names, addresses, and requirements of customers as well as the business advantage of personal contacts with customers is recognized in Indiana as a protectable interest and that, in addition, referral sources are recognized as protectable interests. The court concluded "[h]ere, during the almost three (3) year business relationship between [Glacier] and [Buffkin], [Buffkin] came into contact with a vast number of prospects and candidates, as well as clients of [Glacier], including their names and at the very least, their e-mail addresses, together with the requirements of [Glacier's] customers for prospects and

9

candidates to fill employment positions" and that "[t]his therefore created a legitimate protectable business interest by [Glacier]." Id. at 10.

The court further concluded:

11.  [Buffkin] has admitted to directly competing against [Glacier] after being terminated from working for [Glacier] on June 2, 2011. [Buffkin] has either refused to, or was unable to supply a list of or otherwise explain to the Court in the hearing on [Glacier's] Request for Preliminary Injunction who his clients currently are in the IT and Data Storage industries, together with how many placements he has made in this industry, how much money he has made since June 2, 2011 from those placements, and where and when [he] has obtained the contacts he has made that he has used to make placements in the field in which [Glacier] works and operates.

12.  Further, [Buffkin] either was unable to or chose not to disclose the prospects he has had contact with since leaving his work for [Glacier] in June of 2011, and whether or not any of those leads and/or contacts were generated as a result of his work for [Glacier] from August 12, 2008 to June 2, 2011. For these reasons, [Glacier's] remedies at law during the pendency of this litigation are inadequate.

13.  That [Buffkin's] admitted conduct through his testimony at the January 8, 2013 hearing demonstrates at least a reasonable likelihood of success by [Glacier] on the merits of its lawsuit herein against [Buffkin].

* * * * *

29.  The Court now ORDERS as follows: That until further Order of his Court [] Buffkin shall not, directly or indirectly, whether for compensation or otherwise, either individually, or as an employee, employer, consultant, agent, principal, partner, corporate officer, director, stockholder or in any other individual or representative capacity, enter into, own, manage, engage in, be employed by, operate, participate in, control, aid, assist, or be connected in any way with any business that competes with Glacier Group (in the areas of data storage, cloud, virtualization, big data, managed hosting, managed services, data communication, and telecommunication) in employee recruitment, advertisement of, or

10

performance placement with employers with offices in the continental United States.

Id. at 11, 14. The court concluded that, while Buffkin alleged that Paragraph 6 does not specifically define the industry in which Glacier operates, Paragraph 1 makes it clear that Buffkin was required to perform employee recruitment and performance placement services. The court also concluded that "the evidence and testimony are such that the geographic scope of the covenant . . . is not unreasonable," and granted Glacier's request for a preliminary injunction. Id. at 13. Buffkin now brings an interlocutory appeal from the trial court's ruling.

## ISSUE AND ARGUMENTS OF THE PARTIES

The issue is whether the trial court's grant of a preliminary injunction is clearly erroneous. Buffkin maintains that the non-competition provision of the Agreement is unenforceable because it is unreasonable, that the Agreement does not protect a legitimate interest of Glacier, that the restrictions on activity and geographic scope are overly broad under the circumstances, and that thus the trial court abused its discretion by issuing a preliminary injunction enforcing the provision. Specifically, Buffkin argues that Paragraph 6 of the Agreement has several deficiencies, namely, that under the circumstances of his engagement with Glacier he did not gain a competitive advantage through his relationship with Glacier and thus it would not be unfair for him to compete, that the restriction simply seeks to quash honest competition which is not a legitimate use of a non-competition provision, that the scope of the restricted activity is overly broad in that it improperly seeks to prohibit him from working for a competitor in any capacity and restricts harmless activity, and that the geographic scope of the restriction is overly

11

broad in that it prohibits activity in areas where Buffkin did not have transactions. Buffkin also asserts that the court abused its discretion when it improperly employed the blue pencil doctrine to alter the non-competition provision.

Glacier asserts that it has legitimate, protectable business interests that are protected by the Agreement and that it provided Buffkin with insider knowledge, training in the field of IT employment recruiting and placement, goodwill including the names and business requirements of its customers, and proprietary information including commission structures, payouts, and products and services of its clients. Glacier argues that Buffkin had no experience working in recruiting in the IT field, that Buffkin was given proprietary and confidential information, and that Buffkin "acquired knowledge of the industry in which Glacier operates that was much more in depth than general skills or general knowledge." Appellee's Brief at 14-15. Glacier states that, during the almost three years Buffkin worked for the company, it had seventy clients for whom it provided recruitment placement, that, after ceasing to work for Glacier, Buffkin placed nineteen candidates through his work as a recruiter, and that it would "not have been possible for Buffkin to place those candidates without learning and being given proprietary information by Glacier Group about how to write a contract in this field, how commissions and commission structures work, what clients look for, what products and services customers / clients have and provides, the names of Glacier Group's clients, and candidate lists that Glacier Group provided to Buffkin." Id. at 15. It maintains that "[c]ontrary to the assertion of Buffkin, the covenant not to compete set forth in Paragraph six (6) of [the Agreement] does not prevent Buffkin from recruiting or working in any

12

employee recruiting or performance placement business, regardless of area of concentration" and that Buffkin is not prohibited from working in recruiting in fields or industries "that Glacier Group does not recruit candidates in." Id. at 16-17. Glacier acknowledges that the language added by the trial court should be stricken because the court is not permitted to add language to the covenant not to compete.

In his reply brief, Buffkin argues that he has had no contact with any client of Glacier after the termination of the Agreement and that any assertion to the contrary is pure speculation, and that there was no goodwill generated between he and Glacier clients that warrants protection. Buffkin also notes that he was an independent contractor and that, as such, any contact he had with potential job candidates was entirely his own and therefore that the kind of goodwill that is protectable by non-competition agreements is not present in this case. He maintains that there is no evidence that he received any proprietary information and that any information was available to the general public and readily ascertainable.

STANDARD OF REVIEW

The grant or denial of a request for a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion. Gleeson v. Preferred Sourcing, LLC, 883 N.E.2d 164, 171-172 (Ind. Ct. App. 2008) (citing Ind. Family & Soc. Servs. Admin. v. Walgreen Co., 769 N.E.2d 158, 161 (Ind. 2002)). When determining whether to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. Id. at 172. When findings and conclusions thereon are made, we must determine if the

13

trial court's findings support the judgment. Id. We will reverse the trial court's judgment only when it is clearly erroneous. Id. Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. Id. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. Id. We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. Id. Also, the power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor. Id.

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence the following: (1) a reasonable likelihood of success at trial; (2) the remedies at law are inadequate; (3) the threatened injury to the movant outweighs the potential harm to the nonmoving party from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction. Id. If the movant fails to prove any of these requirements, the trial court's grant of an injunction is an abuse of discretion. Id.

### DISCUSSION

Buffkin maintains that there is no reasonable likelihood of success in this case because Paragraph 6 of the Agreement is unreasonable and unenforceable. He argues that the provision does not protect a legitimate interest of Glacier, that the scope of the restricted activity is unreasonable and overly broad, and that the geographic scope of the restriction is unreasonable. We thus address whether the conclusion that Glacier has

14

shown by a preponderance of the evidence a reasonable likelihood of success at trial is clearly erroneous.

We first observe that Indiana courts have long stated that covenants which restrict a person's employment opportunities are strongly disfavored. See Cent. Ind. Podiatry, P.C. v. Krueger, 882 N.E.2d 723, 728-729 (Ind. 2008) ("This Court has long held that noncompetition covenants in employment contracts are in restraint of trade and disfavored by the law.") (citing Dicen v. New Sesco, Inc., 839 N.E.2d 684, 687 (Ind. 2005); Harvest Ins. Agency, Inc. v. Inter-Ocean Ins. Co., 492 N.E.2d 686, 688 (Ind. 1986); Licocci v. Cardinal Assocs., Inc., 445 N.E.2d 556, 561 (Ind. 1983); Donahue v. Permacel Tape Corp., 234 Ind. 398, 404, 127 N.E.2d 235, 237 (1955); RESTATEMENT (SECOND) OF CONTRACTS, § 188 cmt. g (1981) ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.")); Coates v. Heat Wagons, Inc., 942 N.E.2d 905, 913 (Ind. Ct. App. 2011) (finding that "Indiana courts strongly disfavor as restraints of trade covenants not to compete in employment contracts"). We also note that the fact that Buffkin was identified as an independent contractor in the Agreement does not alter our review of the covenant not to compete. See Harvest, 492 N.E.2d at 688 ("As the parties were engaged in a principal-agent relationship, we will employ the stricter scrutiny utilized in reviewing employer-employee covenants."); see also Paragon Tech., Inc. v. Infosmart Tech., Inc., 718 S.E.2d 357, 358 (Ga. Ct. App. 2011) ("[R]estrictive covenants in contracts for services by independent contractors [are] . . . treated like

15

employee covenants ancillary to employment contracts.") (citation and internal quotation marks omitted); Eichmann v. Nat'l Hosp. and Health Care Servs., Inc., 719 N.E.2d 1141, 1146 (Ill. Ct. App. 1999) ("Plaintiff's status as an independent contractor does not change the nature of defendant's interest. Illinois law does not hold restrictive covenants contained in an independent contractor agreement to a less strict standard than those in employment contracts."); Zellner v. Stephen D. Conrad, M.D., P.C., 589 N.Y.S.2d 903, 906 (N.Y. App. Div. 1992) (holding in part that an at-will employee or independent contractor can be bound by a restrictive covenant and noting that, "for purposes of our analysis" related to whether an agreement to refrain from competition was unreasonable and unenforceable, "no distinction need be drawn between the independent contractor, the position of the plaintiff here, and the at-will employee . . . .").

The Indiana Supreme Court has held that "[t]o be enforceable, a noncompetition agreement must be reasonable" and that "[u]nlike reasonableness in many other contexts, the reasonableness of a noncompetition agreement is a question of law." Krueger, 882 N.E.2d at 729 (citation omitted). In arguing the reasonableness of a non-competition agreement, the employer must first show that it has a legitimate interest to be protected by the agreement. Id. (citations omitted). The employer also bears the burden of establishing that the agreement is reasonable in scope as to the time, activity, and geographic area restricted. Id. Non-competition agreements are strictly construed against the employer. Krueger, 882 N.E.2d at 729; Press-A-Dent, Inc. v. Weigel, 849 N.E.2d 661, 668-669 (Ind. Ct. App. 2006), trans. denied.

16

In Coates, we stated that "[a] legitimate protectable interest is an advantage possessed by an employer, the use of which by the employee after the end of the employment relationship would make it unfair to allow the employee to compete with the former employer." 942 N.E.2d at 913 (citations and internal quotation marks omitted). We held that goodwill, including secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact, is a legitimate protectable interest. Id. Also subject to protection as goodwill is the competitive advantage gained for an employer through personal contacts between employee and customer when the products offered by competitors are similar. Id.

However, we also observe that the "general skills" acquired in working for an employer may be transferred unless this occurs under circumstances where their use is adverse to his employer and would result in irreparable injury. Id. Indeed, "[a]lthough an employer has a protectible property interest in the good will of his business (including secret or confidential information), the same is not true regarding the general knowledge, information or skills gained by the employee in the course of his employment." Brunner v. Hand Indus., Inc., 603 N.E.2d 157, 160 (Ind. Ct. App. 1992); see also Donahue, 234 Ind. at 411, 127 N.E.2d at 241 ("[W]hile an employer, under a proper restrictive agreement, can prevent a former employee from using his trade or business secrets, and other confidential knowledge gained in the course of the employment, and from enticing away old customers, he has no right to unnecessarily interfere with the employee's following any trade or calling for which he is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge

17

he has acquired or increased through experience or even instructions while in the employment.") (citation omitted); <u>Wagler Excavating Corp. v. McKibben Const., Inc.</u>, 679 N.E.2d 155, 157-158 (Ind. Ct. App. 1997) (stating that "[p]ublic policy prohibits any unnecessary interference with a person's calling for which he is fitted and from which he may earn a livelihood," that "[t]hus, Indiana courts disfavor covenants which restrict a person's liberty of action in his business or trade," that "[a]ccordingly, Indiana courts will not hesitate to strike down any such restrictive covenants which are the least bit overly broad with respect to the 'protectible interest' at stake," that "[w]here the underlying protectible interest is minimal, courts will closely scrutinize the terms of the restraint," and that "[t]he burden is on the party seeking to enforce the covenant to demonstrate that the injunction is necessary to protect a legitimate business interest"), <u>trans. denied</u>; <u>Captain and Co. v. Towne</u>, 404 N.E.2d 1159, 1162 (Ind. Ct. App. 1980) ("[The employer], however, is not entitled to protection from an employee's use of his knowledge, skill or general information acquired or increased through experience or even instructions while in the employment.").

A.    INTEREST TO BE PROTECTED

We first address whether Glacier has demonstrated that it has a legitimate interest to be protected by the Agreement. This court has stated:

> An employer may not simply forbid his employee from subsequently operating a similar business. The employer must have an interest which he is trying to legitimately protect. There must be some reason why it would be unfair to allow the employee to compete with the former employer. The employee should only be enjoined if he has gained some advantage at the employer's expense which would not be available to the general public.

<u>Norlund v. Faust</u>, 675 N.E.2d 1142, 1154 (Ind. Ct. App. 1997), <u>trans. denied</u>.

18

Although Hilleboe testified that, when Buffkin began to work for Glacier, he had no recruiting or IT experience, that Glacier "taught him everything that he knows about how to recruit, who to recruit, when to recruit them, what language to use, how the contracts were written," and that Buffkin learned about "commissions, commissions structures, payouts, products and services of those organizations that we recruit for" from Glacier, see Transcript at 11, the accumulated training, knowledge, and skills acquired by Buffkin are not, in themselves, legitimate interests to be protected, even where the training and knowledge were acquired or increased through experience while working for Glacier. See Brunner, 603 N.E.2d at 160; Donahue, 234 Ind. at 411, 127 N.E.2d at 241.

Moreover, Glacier has not met its burden of producing evidence that Buffkin had access to proprietary information which gave him some advantage at Glacier's expense. Buffkin indicated that he did not have any contact with Glacier's clients or their representatives. He testified that he had "no communication with any companies" and "was not allowed to have communication with any companies," and that his role was to simply find candidates with the specific skill sets necessary for their hire. Transcript at 42. Buffkin testified that, with respect to positions to be filled for Glacier's clients, he would be provided with a job description, the company seeking the candidate, a set of skills the company was looking for, and a compensation range related to the position. Buffkin stated that he never made any contact with any of Glacier's customers after the Agreement was terminated. Buffkin also testified that there were no trade secrets or proprietary information gained as a result of his relationship with Glacier and that "[i]t was a recruiting form and we didn't have any customer list, client list . . . ." Id. at 46.

19

Glacier did not present evidence that Buffkin used or was able to use its personal contacts or the relationships it had developed with its clients or its representatives to "entic[e] away old customers" of Glacier. See Donahue, 234 Ind. at 411, 127 N.E.2d at 241. While the advantage of Glacier "acquired through representative contact" would be a legitimate protectable interest and "the competitive advantage gained for an employer through personal contacts between employee and customer" would be subject to protection, see Coates, 842 N.E.2d at 913, the record reveals that, although Buffkin was informed of the client seeking to fill a position, Glacier did not present evidence that it obtained a competitive advantage through Buffkin's personal contacts or relationships with clients, and in fact Buffkin testified that the personal contacts of and relationship developed by Glacier were not shared with him. The information provided to Buffkin which related to specific recruiting assignments and activities was not of the nature or sort of information "the use of which by the employee after the end of the employment relationship would make it unfair to allow the employee to compete with the former employer." See id. If there is an underlying interest to be protected by a non-competition provision of the Agreement, the interest is minimal.

## B. REASONABLENESS OF RESTRICTIONS

We next turn to whether the terms of the Agreement are reasonable. "Where the underlying protectible interest is minimal, courts will closely scrutinize the terms of the restraint." Wagler, 679 N.E.2d at 158. To the extent that Paragraph 6 of the Agreement protects a legitimate and protectable interest, even if minimal, the non-competition provision of the Agreement must also be reasonable in terms of the time, activities, and

20

geographic area restricted. See Krueger, 882 N.E.2d at 729. In examining whether the Agreement is reasonable, we also note that "the validity of a non-competition clause is dependent not merely upon the covenant itself but upon the entire contract and the situation to which it is related." Licocci, 445 N.E.2d at 563. Buffkin maintains that the Agreement is unreasonable in terms of the geographic restriction and the activities restricted.

1.    Geographic Restrictions

The Agreement restricts Buffkin from performing recruiting or placement services for employers "with offices in the continental United States." Appellant's Appendix at 87. "Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves." Krueger, 882 N.E.2d at 730 (citing Slisz v. Munzenreider Corp., 411 N.E.2d 700, 707-709 (Ind. Ct. App. 1980) (know-how or "unique skills" derived from the employer may justify a wider scope)). We have already determined that the legitimate interest Glacier seeks to protect is minimal. The basis justifying restriction is Glacier's investment or interest in developing its customer base across the United States. See id. Hilleboe testified that Glacier engaged in recruiting nationwide and primarily in metropolitan cities and had "probably forty-five active clients that request [its] services . . . ." Transcript at 4. Although Glacier may have current client contacts in a number of metropolitan cities and may desire to provide recruitment and placement services for additional companies nationwide, and indeed it included language in the Agreement that its "client base is drawn from throughout the country," see Appellant's Appendix at 87, Glacier does not point to evidence regarding the operations or locations

21

of its approximately forty-five active customers.  When Buffkin was asked, "[d]uring the period of August 12 of 08 through June 2nd of 2011 how many deals . . . prospects [he brought] to the Glacier Group that actually closed," he stated "[i]t wasn't really a whole lot but I guess fifteen."  Transcript at 43-44.  The Agreement contemplates a restriction prohibiting Buffkin from providing recruiting and placement services in a very large geographic area, which essentially precludes him from working in the field.  See Harvest, 492 N.E.2d at 688 (noting the established rule that in most instances a spatial restraint upon a former employee must be limited to the area of the employee's sales territory) (citing Licocci, 445 N.E.2d at 562-563).  We also note that an employer does not necessarily currently possess a legitimate protectable interest in each region in a geographic area (such as the continental United States) or each relevant market for its products or services by mere virtue of the fact that the employer may wish or has a vision to expand its business into every such region or relevant market.  It was incumbent upon Glacier to present evidence demonstrating it had a legitimate interest to be protected in the relevant markets in which it sought to prohibit Buffkin's activity and that any competition presented by Buffkin's activities in those markets would be unfair.  We conclude that the restriction prohibiting Buffkin from providing or performing any recruitment or placement services anywhere in the continental United States exceeds the bounds of reasonableness.  See Krueger, 882 N.E.2d at 730 (holding that the geographic restriction was unreasonable under the facts of the case); Dicen, 839 N.E.2d at 689 ("Restricting Dicen from working in the land remediation business anywhere in the

22

United States for two years after he left New Sesco exceeds the bounds of reasonableness, especially when Dicen's contacts were in a limited number of states.").

2.    Restriction Regarding Scope of Activities

Next, we turn to whether the Agreement is reasonable in scope as to the activity restricted, specifically whether the Agreement lacks a reasonable customer- or competitor-specific restriction. Paragraph 1 of the Agreement stated in part that "[t]he work provided by [Buffkin] is employee recruitment and performance placement for customers and clients of [Glacier]." Appellant's Appendix at 85. Paragraph 6 of the Agreement stated in part that Buffkin "shall not . . . either individually, or as an employee, . . . consultant, agent, . . . or in any other individual or representative capacity . . . engage in, be employed by, operate, participate in, control, aid, assist, or be connected in any way with any business that competes with [Glacier] in employee recruitment or performance placement with employers . . . ." Id. at 87. By its terms, the Agreement prohibits Buffkin from being connected "*in any way with any business that competes with* [Glacier] in employee recruitment or performance placement . . . ." Id. (emphasis added). At the hearing, Hilleboe testified that Glacier engages in "executive recruiting in the IT . . . Sector for companies related to Data Storage, hosting, location, virtualization, manage services" and that its services were "for primarily sales people, pre-sales engineers, systems engineers, inside sales, leadership positions being directors VP's, CFO's, CEO's those types of positions." Transcript at 4. Hilleboe also testified Glacier had "probably forty-five active clients." Id. Buffkin testified that he placed candidates for Glacier in the areas of sales representatives and sales engineers, and when asked if he placed

23

"anyone other than individuals in the field of information technology," he answered "No." Id. at 41.

While the testimony at the hearing indicates that Glacier's recruitment and placement services appear to be limited to or focused primarily in the IT field, the language of the Agreement does not specifically refer to recruitment and placement for customers in the IT field. Buffkin takes issue, essentially, with the lack of a customer- or competitor-specific restriction. The employee recruitment and placement field is very large and consists of many in-house employees, human resource personnel, and independent agents. This is also true, though less so, where recruitment and placement is limited to employers and employees in the IT field. Glacier's clients or customers could conceivably include every company in the continental United States providing or requiring IT or related services, or at least those providing or requiring those specific IT services to which Hilleboe testified. The broadly-worded restriction, namely, that Buffkin may not be "connected in any way with any business that competes" with Glacier, see Appellant's Appendix at 87, makes no distinction between past, current, or future customers or clients of Glacier. Nor does the broad language make any distinction between, on the one hand, a contractor who later works as a recruiting agent or for another recruiting firm and, on the other hand, a contractor who later becomes employed or connected with an IT or other company (whether in a recruiting or placement capacity or another role) which is a current, or could be a future, customer or client of Glacier. It appears that the Agreement by its terms was intended, and nothing inconsistent was presented at the hearing, to apply to or encompass all of these scenarios. It appears that

the Agreement prevents Buffkin from working both for any direct competitor such as a recruiting company or a competitor of a customer (or potential customer) in any capacity, and many companies in the United States are at least potential customers of Glacier, and this interpretation of the Agreement is shared by Glacier. At the hearing, Hilleboe indicated that Buffkin had been working for Digital Fortress and that Digital Fortress is a direct competitor of Glacier. When asked "[s]o [D]igital [F]ortress isn't a competitor for the Glacier Group it's a data location entity it's not a competitor," Hilleboe responded "No you're wrong it is a competitor because Digital Fortress is a (inaudible) client that competes with the clients that we recruit for." Transcript at 32. When asked "So is [D]igital [F]ortress that's not an executive placement firm," Hilleboe stated "No." Id. Buffkin indicated that Digital Fortress was not in existence prior to his departure from Glacier and that it was not a competitor of Glacier. The restriction here, which prohibits Buffkin from working for any of those customers or potential customers across the United States, is certainly excessive to protect Glacier's legitimate interests.

We conclude that the scope or breadth of the Agreement's non-competition provision as it relates to the activities which it prohibits is unreasonable. See Vukovich v. Coleman, 789 N.E.2d 520, 526 (Ind. Ct. App. 2003) (noting that the covenant at issue purported to prohibit competition with IMI and to prohibit Vukovich from owning, managing, operating, or consulting with "a business substantially similar to or competitive with" IMI's business and holding that "[b]ecause the covenant before us as written 'could apply to the entire world,' and includes no provision otherwise limiting its scope, the covenant is invalid and the injunction enforcing it was improperly granted")

25

(citing Struever v. Monitor Coach Co., Inc., 156 Ind. App. 6, 7-10, 294 N.E.2d 654, 655-656 (1973) (noting that Struever agreed that, for a period of three years, he would not "in any manner whatsoever, directly or indirectly, compete or engage in a business which is in competition with the business of Action," that Action's products were sold through 129 dealers in twenty-nine states, and that Monitor contended that "confining the operation of the covenant to their list of 129 dealers in 29 states[] is reasonable," holding there was no evidence defining the specific territories of the dealers and that the covenant is not enforceable since "[a]s written it could apply to the entire world," and reversing the preliminary injunction based upon the covenant), reh'g denied. Such an expansive scope severely restricts Buffkin's ability to use the experience he has acquired during his career. See Brunner, 603 N.E.2d at 160; Donahue, 234 Ind. at 411, 127 N.E.2d at 241.

Based upon the language of the Agreement and the record, and keeping in mind that non-competition agreements are strictly construed against the employer, see Press-A-Dent, 849 N.E.2d at 668-669, we conclude that Paragraph 6 of the Agreement, to the extent that it protects a legitimate interest of Glacier, is unreasonable in terms of the activities it prohibits and its geographic restraints. Accordingly, the non-competition covenant in the Agreement was unenforceable. See Dicen, 839 N.E.2d at 689 (finding that the covenant not to compete exceeded the bounds of reasonableness and holding that thus the covenant was unenforceable). Glacier failed to meet its burden of showing a reasonable likelihood of success at trial. As a result, the court erred in granting its request for a preliminary injunction.[2]

---

[2] Because we find the Agreement unenforceable, we need not address whether the court

26

CONCLUSION

For the foregoing reasons, we reverse the trial court's order and remand for further proceedings consistent with this opinion.

Reversed and remanded.

NAJAM, J., and MATHIAS, J., concur.

---

improperly employed the blue pencil doctrine.